**Glen William NICKERSON, Jr., Petitioner,**

v.

**Ernie ROE, Warden, Respondent.**

**No. C 98–04909 MHP.**

United States District Court, N.D. California.

March 17, 2003.

Edward M. Sousa, San Jose, CA, M. Gerald Schwartzbach, Law Offices of M.

Gerald Schwartzbach, Mill Valley, CA, for Petitioner.

Dane R. Gillette, Gregory A. Ott, CA State Attorney General's Office, San Francisco, CA, for Respondent.

## MEMORANDUM & ORDER

PATEL, Chief Judge.

Petitioner Glenn "Buddy" Nickerson is an inmate of the California state prison at Los Angeles, California, following his conviction on two counts of murder and one count of attempted murder. On December 28, 1998, Nickerson filed a petition for a writ of habeas corpus with this court challenging his conviction on grounds of ineffective assistance of counsel and police and prosecutorial misconduct which deprived him of due process. In support of his petition, Nickerson presented a variety of evidence not brought forth at his trial to show that he is factually innocent of the crimes charged. The court granted Nickerson's request for an evidentiary hearing on his petition. After having reviewed the record, the testimony and evidence submitted at the evidentiary hearing and the parties' arguments and briefs, and for the reasons set forth below, the court rules as follows.

## BACKGROUND

Along with two codefendants, Murray Lodge and Dennis Hamilton, Nickerson was charged with the murders of John Evans and Mickey Lee King and the attempted murder of Michael Osorio.[1] Nickerson and Hamilton were tried jointly in 1987. Because the State of California sought the death penalty against Lodge, he was tried in separate proceedings in 1992.

### I. Evidence Presented at Nickerson's Trial

Because both the procedural issues raised by the petition and Nickerson's substantive claims require analysis of the evidence presented against Nickerson at trial, the court first summarizes the state's original case and Nickerson's defense.

#### A. The Crime Scene

At about 1:00 a.m. on September 15, 1984, Santa Clara County Sheriff deputies responded to shots fired at an address on Ronda Street in San Jose, California. RT 5666. When they arrived, they found John Evans lying unconscious in his front entryway with a severe head wound. RT 5672–73. Evans never regained consciousness. RT 5673.

The officers entered the house and found Michael Osorio in the hallway and the body of Mickie Lee King in the kitchen. RT 5677. Both men had wounds to the back of their heads and their hands were handcuffed behind their backs. RT 5677–79.

Twenty minutes later, Sergeant Joseph Kirby and his police dog, Ajax, arrived at the crime scene. RT 5797. Kirby noticed that Osorio had a head wound and was acting in a dazed manner. RT 5800, 5802. Osorio identified himself to Kirby. RT 5827. In response to Kirby's questions about who had hurt him, Osorio answered, "I don't know who they were. We were asleep. I don't know them." RT 5827, Exh. 2 (Kirby notes).

After a search of the area, Kirby discovered a fingertip of a bloodstained glove underneath a car in Evans' driveway. RT 5803. Ajax picked up a human scent from the glove and began following a trail of blood down Ronda street in front of Evans'

---

**1.** A fourth man, Brent Wofford, was convicted of helping to plan the break-in and providing handcuffs used to restrain the occupants of the house.

house, left on Union Street and into the Lakeside Apartment Complex off of Union. RT 5803–05. In the apartment complex driveway Ajax found a rubber glove and a cloth glove with the same scent he was following. RT 5805–06. There was a large amount of blood on the driveway and the wall of a nearby garage and a bloody handprint on an adjacent dumpster. RT 5807.

The trail led to the front of the complex on Heimgartner Street where the blood spatters ended. RT 5807–08. Ajax followed the scent trail left on Heimgartner and into a second driveway where he ultimately lost the scent at a grassy area. RT 5807–08.

A resident of the complex came out and told Kirby that he had seen two people running into a pond area and that one appeared to be holding a cloth to his abdomen. RT 5819–20, 5832–33.

Ajax picked up a second scent at the apartment complex's pond area. RT 5820. He followed it to the driveway of the complex off Union and to the rear yard fence of Evans' next door neighbor. RT 5820–23. A number of .357 caliber shell casings were found along the scent trail. RT 5821, 5823.

Evidence technicians photographed the crime scene and gathered fingerprints, bullet fragments and casings, a number of handguns, a briefcase with money and drugs and other physical evidence. RT 5885–6046.

None of the physical evidence gathered at the scene was linked with Nickerson. No gun used at the scene was ever found with Nickerson or otherwise associated with him. No fingerprints or clothing found at the scene were matched with Nickerson. The blood trail along Ronda Drive and Union Avenue did not match Nickerson's blood type, and prosecutors argued in Nickerson's trial that the blood trail was left by another unidentified perpetrator.

## B. Nickerson's Motive

At trial, the prosecution argued that the killings were committed by Nickerson as part of a robbery and in revenge for the shooting of Nickerson's brother by Evans. Less than a month before Evans' death, Buddy's brother, Nicky Nickerson, went to Evans' house with a shotgun. RT 6598–99. Nicky Nickerson seized Evans' live-in girlfriend, entered the home holding her at gunpoint, and demanded that Evans come out and speak with him. RT 6598–99. A scuffle ensued in which Evans shot Nicky Nickerson in the chest and literally kicked him out of the house. RT 6600–01.

The prosecution presented testimony that Nickerson had made threats against Evans. Deputy Sheriff Tony Silva testified at trial that on the night that Nicky Nickerson was shot, Buddy Nickerson told Silva that "I will give you people thirty days to take care of it or else I will," although Silva failed to include this statement in his report. RT 7530. Barbara Payne, Evans' live-in girlfriend who was present when Nicky Nickerson was shot, testified that on August 25, 1984, she answered the phone at Evans' house. She spoke with someone she believed to be Buddy Nickerson who told her, "Tell John he has 31 days." RT 6608. Deputy Sheriff Edward Atlas testified that on August 31, 1984, Nickerson told him that Evans had set Nickerson's truck on fire while Nickerson was in a nearby restaurant. RT 6418. Nickerson told Atlas that "if Evans didn't leave him alone there would be war" and that Atlas should relay that message to the sheriffs' detectives. RT 6421–22. Judy Bryant testified that prior to the shootings, she heard Nickerson discuss his wish for revenge. RT 6473.

In response to the evidence of motive, Nickerson sought to establish that he and Evans had worked out their differences over Nicky Nickerson's shooting. A bartender, James Lumley, testified that he saw John Evans and Nickerson after the Nicky Nickerson shooting and that they talked and drank together for thirty or forty minutes. RT 7648–49. Barbara Payne also testified that a few days before his death, Evans told her that he and Nickerson had resolved the problems between them and that there would be no more trouble. RT 7509. Michael Osorio, one of the victims, testified that Evans told him that his problems with Nickerson had been resolved. RT 7208–09.

## C. *Eyewitness Identifications of Nickerson*

At Nickerson's trial, two eyewitnesses positively identified Nickerson and placed him at the scene of the murders. Michael Osorio, one of the victims, testified that Nickerson was one of the masked men who broke into the house. Brian Tripp, a resident of the nearby apartment complex, identified Nickerson as a man he saw fleeing the scene. Another witness, nearby resident Sharon Silberhorn, did not see anyone the night of the murders, but identified Nickerson as a man that she saw in a car near Evans' house the evening prior to the shootings.

### 1. *Michael Osorio*

Michael Osorio, the sole survivor of the shooting, gave the police the only eyewitness account of the events inside Evans' home. Osorio testified at trial that on the evening of September 14, 1984, he drove from Sacramento to San Jose to help Evans move his car painting equipment to Sacramento. RT 7134. A good friend of Evans, Osorio had taught Evans how to manufacture methamphetamine. RT 7122, 7127. When Osorio arrived at Evan's house, he met Evans' mother and sister,

Phyllis, who were visiting. RT 7139–40. Mike Riley and Mickie Lee King, Evan's half-brother, were also there. RT 7139–40. At some point thereafter, Evans' mother and sister left. RT 7142. After receiving a phone call, Evans told Osorio that he had to go somewhere and would be right back. RT 7142–43. Evans did not say where he was going or who called. RT 7143. Evans asked Osorio to wait for him to return. RT 7142–43. Riley and Evans, both armed with guns, left in separate cars. RT 7143–44.

Osorio fell asleep on the couch and was later awakened by the sound of a door being kicked in. RT 7147. Someone rushed into the room and hit Osorio on the head with something that felt like wood. RT 7148. Osorio was pulled off the couch onto the floor and handcuffed with his arms behind his back. RT 7148–49. Osorio testified that he next heard the sound of dogs attacking someone or something and heard King yelling and telling someone not to shoot. RT 7149–50. He heard the sounds of someone being beaten and saw King being brought into the living room. RT 7150.

Osorio testified that King was then shoved to the floor next to him, face down with his hands cuffed behind his back. RT 7151. King said, "Come over here, buddy, and loosen the fucking cuffs." RT 7151. Osorio saw a man wearing a ski mask over his head go over to King. RT 7151. Osorio heard King being hit in the head with what sounded like a gun. RT 7154. King was later moved to the kitchen. RT 7167.

Although all of the intruders wore ski masks at all times, Osorio felt that he could distinguish at least three different attackers. RT 7161. Osorio never saw more than three masked men at any one time. RT 7160.

The masked intruders asked Osorio who Evans was with, where he went, and when

he would be back. RT 7154. Osorio told them that Evans went to Reno for the weekend. RT 7155. Osorio was hit in the head in response. RT 7155. Osorio felt what he thought was a gun put to the back of his head. RT 7168. At some later point, Osorio heard a car pull up. RT 7169. Someone turned down the volume on the television set and said, "He's here." RT 7169. Osorio does not remember what happened after that. RT 7169.

Osorio stated at Nickerson's trial that the masked man who responded to King's request to loosen his cuffs was "heavy-set," and based on this he "associated that person as being Buddy Nickerson." RT 7151. Osorio did not notice anything about this person other than his build. RT 7228. Osorio described his level of certainty about his identification of Nickerson as ten out of ten. RT 7172.

Various pieces of evidence emerged at trial which undermined Osorio's identification of Nickerson. Osorio had been hit on the head repeatedly during the break-in and was eventually shot in the head. As such, his ability to remember the events of the evening became an issue at Nickerson's trial. Osorio testified to being groggy throughout the episode due to repeated blows to the head delivered by the intruders. RT 7148–49, 7154–56, 7162, 7165.

An expert in physiological psychology, Dr. Ralph Kiernan, Ph.D., testified that while Osorio's type of injury did not generally result in loss of pre-trauma memory, specific evaluation of loss of an individual's pre-trauma memories was impossible. RT 6165–66, 6174. Dr. Kiernan also testified that soon after a trauma the brain would be "at its maximally dysfunctional state" and responses might be less reliable than some months later.[2] RT 6169–70. Osorio testified that when he first got out of the hospital, he could not remember his own name or what day it was, although his memory was constantly getting better. RT 7159. Throughout his testimony, Osorio was unable to remember much of his prior testimony or statements as a result of brain damage from his injury. He repeatedly testified as to the problems with his memory. *E.g.*, RT 7198–7202.

Osorio also testified that the district attorney's office had held "recollection refreshing sessions" prior to trial during which time Osorio was read his prior testimony and asked about it. *See* RT 7226, 7259, 7261. Significant aspects of Osorio's testimony changed over time, such as whether Evans had given him a physical description of petitioner or shown him photographs of the Nickersons prior to the shootings, RT 7235–36, 7239–41, 7264–67; whether the masked man he identified as Nickerson held a pistol, a shotgun, or no weapon at all, RT 7174, 7256–57; and whether he had been influenced by King referring to an attacker as 'buddy,' RT 7259.

Another issue that arose in Osorio's testimony was whether he knew Nickerson well enough at the time of the shootings to have identified him. Osorio had previously seen Nickerson only once, about two years before the incident when Nickerson was doing some yardwork for Evans, and did not remember being introduced to him or looking at his face. RT 7170, 7228–29. Osorio could not even remember whether Nickerson had been working with his shirt on or off. RT 7229.

The defense also argued that due to brain trauma caused both by the shooting and the brain surgery, Osorio had been susceptible to the suggestions by the two lead detectives, Sgt. Jerry Hall and Sgt.

---

**2.** Osorio's treating neurosurgeon testified that Osorio may have been more alert during the initial interviews with police prior to the surgery, before injury from bleeding and shock, than in the days following the surgery. RT 6354–62.

Brian Beck, that Nickerson had been an attacker. Osorio's first statement at the scene was that the crime occurred when he was in bed and that he did not know what happened. RT 5827. He told one officer who questioned him, "I don't know who they were. We were asleep. I don't know them." RT 5827. At this point, he was alert enough to give officers his name and answer questions. When first interviewed at the hospital later that day, Osorio told Detective Hall only that the intruders were white male adults of average builds wearing ski masks. RT 7469.

Osorio's initial identification of Nickerson apparently occurred at the hospital the following day, after Osorio had undergone brain surgery for the gunshot wound to his head. RT 7474–75. Although Osorio testified that he did not remember this identification, RT 7220, 7175–76, Detective Hall testified that Osorio "emphatically" identified Nickerson as one of the perpetrators, RT 7474. Osorio was not shown photographs at this interview, but simply named Nickerson as one of the intruders. Detective Hall later testified at Lodge's trial that Osorio made the identification from personal knowledge of Nickerson's appearance. LT1 9421. Beck and Hall did not tape record the interview, LT1 9422, nor were contemporaneous notes referred to either in state court proceedings or in the proceedings in this action. Osorio did not remember the interview or seeing Beck and Hall in the hospital, but only remembered Beck's voice. RT 7254–55.

The defense suggested that Osorio might have identified Nickerson in his injured state because he had been expecting trouble from Nickerson at the time of the shooting. Osorio testified that in the weeks prior to the murders, Evans had told Osorio that he was concerned about the Nickersons and had shown him pictures of the brothers. RT 7172. Osorio stated in his testimony that Evans' fears "definitely affect[ed] me feeling that it was Buddy Nickerson that was there." RT 7172. His identification was also influenced by the fact that Evans' girlfriend told him that she thought that Nickerson had made threatening phone calls to Evans prior to the shootings. RT 7233. Osorio also testified that he recognized Nickerson's nickname when King addressed one of the captors as "buddy." [3] RT 7259.

### 2. Brian Tripp

Brian Tripp testified at Nickerson's trial on March 4, 1987, two and a half years after the shootings. At the time of the trial, Tripp was a Colusa County Deputy Sheriff and had been so employed for the previous eight months. RT 6429. At the time of the murders, Tripp lived at a condominium off Heimgartner street, just a block from Evans' house. RT 6429. Tripp testified that while he was in the parking lot of the apartment complex the night of the shootings, a man ran past him. RT 6433. The man was hunched over as if in pain and was holding a towel or a jacket to his stomach. RT 6433–35. He stopped about fifteen feet past Tripp, looked around, unhunched and looked up at the sky, turned in a full circle, then looked at Tripp and asked, "Where the fuck am I?" RT 6436–37. Tripp responded that if he did not belong, he should leave. RT 6437. The man ran back past Tripp, then ran south between the condominium buildings. RT 6437–38. Finding his way blocked by a large fence, the man turned back and ran off to the north. RT 6438. A week later,

---

**3.** At Lodge's second trial, Mary Baker, a lifetime resident of Ronda drive who had an intimate relationship with King, testified that he called other people by the general term of address "buddy." LT2 13158, 13169. Baker testified that King used to called her brother "buddy," though his name was Johnny. LT2 13169.

after he learned of the shootings, Tripp contacted the sheriff's department and later spoke with Sergeants Beck and Hall. RT 6440–41.

During his testimony, Tripp then identified the man he had seen as Nickerson, who was present in the courtroom. RT 6443. Tripp stated in court that he was "positive" that Nickerson was the man he saw. RT 6443. After consulting Beck and Hall's notes, Tripp remembered initially describing the man to the detectives as five feet eleven inches to six feet tall, 190 to 200 pounds with brown shoulder length dirty hair, a moustache, wearing a dark colored, button up long sleeve untucked shirt. RT 6442.

On cross examination, Tripp admitted that Nickerson did not fully fit the description he gave to Beck and Hall. RT 6462. He nonetheless maintained that Nickerson "resembled" the man. RT 6462. Tripp stated that he was "positive" that the man he saw was Nickerson, and reaffirmed prior testimony that he was "nine out of ten" in his certainty in his identification. RT 6443, 6452.

Tripp also acknowledged in his testimony that Beck and Hall had shown him a photographic line-up prior to any in-person identification of Nickerson. RT 6448. Tripp identified three or four of the photographs as resembling the man he saw that evening. RT 6449. Nickerson was one of the photographs Tripp picked out as a possible match. RT 6451. Tripp stated, however, that it was easier for him to identify a person in person than from photographs, and that upon seeing Nickerson in court he immediately identified him as being the man he had seen. RT 6451, 6452.

### 3. Sharon Silberhorn

The night before the shootings, Sharon Silberhorn, a resident of Lakeside Condominiums, returned home at about 10:30 p.m. RT 6512. She observed an older noisy car pull into the complex and drive slowly around the parking area. RT 6512–13. Its occupants appeared to be pointing to various things. RT 6514. Silberhorn described the passenger as a heavyset male with sandy bushy hair, sideburns and a goatee, ponytail, and a tattoo on his right arm. RT 6515. The next night, Silberhorn was awakened by yelling in the parking lot. RT 6516. She heard what she thought was the same loud car she had seen the night before. RT 6516. She did not get out of bed and did not claim to see anything the night of the murders.

Silberhorn testified that she could identify the car by sound because she had "worked around automobiles." RT 6517. On cross-examination, Silberhorn admitted that she worked as the finance manager of an automobile dealership. RT 6549.

At trial, Sharon Silberhorn identified Nickerson as a passenger in the loud "low-rider" car she saw at the Lakeside Apartment Complex on the night before the shootings. The day after the shooting, Detectives Beck and Hall showed Silberhorn a series of photographs. RT 6536. Silberhorn picked out three photographs as resembling the man she saw and focused on one in particular, though no testimony was presented as to which photographs she picked out.[4] RT 7472, 6537.

Silberhorn testified that she initially identified Nickerson three weeks before she testified at Nickerson's preliminary hearing. RT 6538. According to Silberhorn, she was at the Municipal Court with Sergeants Beck and Hall and Inspector McCurdy. RT 6539. Silberhorn testified

---

**4.** In the second trial of Murray Lodge, Beck admitted that Silberhorn failed to identify Nickerson from the lineup presented to her at this interview. LT2 17176–77.

that she was "wandering off looking for a drinking fountain" and began looking in courtrooms. RT 6539, 6560. In the second courtroom, she saw Nickerson and "realized" that he was the man she had seen the night before the shootings. RT 6539–40, 6561.

Inspector McCurdy of the Santa Clara District Attorney's office contradicted Silberhorn's account and testified that her intial in-person identification was not spontaneous. He stated that prior to identifying Nickerson, Silberhorn asked if "the guy was in the courtroom" and then asked permission to look in the courtroom. RT 7498, 7500, 7503. Inspector McCurdy told Silberhorn that Nickerson was in the courtroom and that she could look in. RT 7500. Nickerson was sitting at the counsel table dressed in red prison clothes with chains on. RT 7501. Nickerson was the only defendant in the courtroom at the time. RT 7501. After Silberhorn looked in the courtroom, she told McCurdy that seeing him scared her and that she was fairly certain it was the man she saw. RT 7501. Silberhorn denied Inspector McCurdy's account. RT 6540–41, 6560–61.

### D. *Incriminating Statements Made To Judy Bryant*

Judy Bryant testified that in the early morning hours of the Sunday or Monday following the Evans shootings, Nickerson was over at her house talking on the telephone to someone she presumed to be his mother. RT 6475–77. Bryant testified that Nickerson appeared concerned that

his mother would not be taken care of, and that he said that "it had to happen." RT 6477.

After the court recessed for lunch following cross-examination of Bryant, Bryant indicated to prosecutors that she had further relevant information. The prosecution recalled Bryant to the stand in the afternoon for further examination. Judy Bryant then gave surprise testimony that Nickerson made inculpatory statements to a group of friends. Judy Bryant testified that during the early morning hours of Sunday, September 16, 1984, she took a van ride with a group of people to "go pick up some drugs that was owed to them." RT 6490–91, 6494–95. Nickerson was a member of the group. RT 6493. The discussion turned to the Evans homicides. RT 6491. Judy Bryant testified that Nickerson made "minor comments" to the effect that "they had to die" and "you should have seen his face or something like that." RT 6491–92.

### E. *Other Witnesses*

A number of witnesses heard the shots at Evans' house and saw men fleeing the scene who did not fit Nickerson's description. One saw a thinly built male about five feet eight inches tall with shoulder length hair run across Evans' property, then saw a gold van traveling east on Ronda, away from Union, with its headlights off. RT 5740–57 (testimony of Judy Schattie).[5] Another saw a man of similar

---

5. Judy Schattie, who lived across the street from Evans, saw a person run from the street to one side of Evans' property. RT 5740–43. The person was hunched over and appeared to be protecting his or her midsection as though it were hurt. RT 5746. Judy Schattie originally thought the person to be female. RT 5744. She described the figure as about five feet and seven or eight inches tall, with shoulder length hair, thinly built and wearing dark clothes. RT 5745. She did not see where this person went. RT 5747. Judy Schattie then saw a van, which she thought pulled out of a church parking lot across the street from Evan's house, turn east on Ronda and go past her house. RT 5750. The van traveled slowly and without its headlights. RT 5752–54. She heard the door slam while it was moving, but did not see anyone get in. RT 5754.

height with short hair walk slowly down Ronda then get into a van that was traveling down Ronda, away from Union, with the side door open. RT 5853–56 (testimony of Mary Baker).[6] A witness standing on the corner of Union and Ronda saw a man five feet eight inches tall with medium build and shoulder length hair run past him, hunched over and holding his waist, followed by another man of similar height and build. RT 6064–76 (testimony of Jeffrey Ottoveggio).[7] A resident of Heimgartner Lane, a street about one block south of Ronda, heard shots and saw a man of medium height and build climbing over the fence behind a neighboring condominium complex. RT 5698–5705 (testimony of George Gutierrez).[8]

One witness, Robert Schattie, heard the sound of gunshots coming from Evans' house. RT 5719. He did not see anyone running from Evans' residence after the shots. RT 5735. He reported this version of the events to the police shortly after the shootings. RT 5720. A few days later, an image came to Schattie "in the nature of a day dream," and he contacted the police to supplement his story. RT 5721, 5727. Schattie testified that in this "day dream," he looked out the front window of his house and saw a person near Evans' car. RT 5723. Mr. Schattie, himself a man of

about 240 pounds, described the figure he saw as over 200 pounds, or as big as he was. RT 5728. The man was over six feet tall, with sandy colored hair and a full beard. RT 5728. The figure held a "long gun," such as a shotgun or rifle, which he fired twice. RT 5722, 5725. The person then calmly walked from the car into the street. RT 5727. Schattie never identified the man he saw as Nickerson. In the daydream, Schattie also heard two more gunshots that sounded as if they were from outside Evans' home. RT 5721–22.

On cross-examination, defense counsel inquired further about the description of the memory as a "day dream," asking Schattie whether the vision was "something that you made up or something you remember from this night in your neighborhood?" RT 5734. Schattie replied that he did not know. *Id.* This court finds nothing in the record showing that the prosecution presented physical evidence indicating that a rifle or shotgun was fired outside Evans' house. In its lengthy closing, the prosecution devoted only a few sentences to Mr. Schattie's testimony. The prosecutor referred to him as "the dream witness" and suggested that the vision might have resulted from the fumes from Evans' methamphetamine lab pervading the neighborhood. RT 7727.

6. Mary Baker, at home on Ronda Street at the time of the shooting, knew John Evans. RT 5842. She heard him return home and shortly thereafter heard a voice that she did not recognize and then gunfire. RT 5853–54. From her window, she saw someone slowly moving toward Union Street. RT 5856. Baker described the man as being five feet six or seven inches tall with short hair and bent over. RT 5856. He got into a van that was moving slowly down Ronda with the side door open. RT 5856.

7. Jeffrey Ottoveggio and three friends heard the shooting from the corner of Ronda and Union and saw a man run past them. RT

6064–66. The man was a Caucasian, about five feet eight inches tall, of medium build, with dark shoulder-length hair and wearing dark clothes. RT 6072–74. He appeared to be bleeding from a wound in his side or stomach. RT 6068–69. A second man of similar height and build ran by. RT 6076.

8. George Gutierrez of 1977 Heimgartner heard what sounded like one or two gunshots at about 1:00 a.m. RT 5698–5702. He got out of bed, looked out the window, and observed a man climbing over a fence behind the condominium complex. RT 5702. The man was of medium height and build and wore nondistinctive dark clothing. RT 5704–05.

## F. Nickerson's Alibi

Nickerson presented alibi evidence that he was sleeping in his truck in a friend's driveway at the time of the shootings. The testimony is summarized below.

During the day of September 14, 1984, Nickerson was with a friend, Keith Banks, driving around and drinking. RT 6695–96. That evening they were at the home of Keith's brother, Dion, where there was a party for Dion's wife, Kristin. RT 6658, 6683. Nickerson and Keith left the party at 11:00 p.m. RT 6697. Keith walked home and Nickerson, who felt sick, got into his truck parked in Dion and Kristin Banks' driveway. RT 6697, 6662. When Dion and Kristin Banks left the party at around 11:30 p.m. to drive a friend home, Nickerson was in his truck. RT 6662. Kristin Banks estimated they returned home between 12:00 a.m. and 12:30 a.m., RT 6664, while Dion estimated their return between 12:30 a.m. and 1:00 a.m. RT 6670, 6687. On her way back into the house, Kristin Banks spoke briefly with Nickerson, who was still in his truck with his feet sticking out the window and his boots inside the house. RT 6664. When she awoke the next morning, Nickerson was still there and his boots were still inside the house. RT 6692.

Cindy Price and Ralph Banks spent from nine or ten o'clock, RT 7404, until the early morning hours, RT 7408, talking in Price's truck twenty feet from Nickerson's vehicle. RT 7407. She saw Nickerson get into his truck barefoot about an hour after she and Ralph Banks went outside. RT 7405. Price did not see Nickerson leave his truck. RT 7407. Ralph Banks, who occasionally went inside to use the bathroom or get another drink, testified that he never saw Nickerson leave the truck. RT 7431–32. Price saw Nickerson talking on the telephone at the Banks' house the next morning. RT 7409.

## G. Evidence Against Other Defendants at Trial

At Nickerson and Hamilton's joint trial, the prosecution introduced a number of inculpatory statements by Hamilton and Lodge and physical evidence that tied both men, but not Nickerson, to the scene of the crime.

### 1. Testimony of Norma Goytia

At trial, the prosecution introduced the testimony of Norma Goytia that Lodge, Hamilton and a third man "Bob" had access to a gun and were seen together on the day of the shootings. Hamilton, Goytia's ex-husband, often stayed at her house with Lodge. RT 6719. On the day of the shootings, she received two or three phone calls for Lodge from a man named "Wolf." RT 6738. Later that day, Hamilton argued with Goytia over her .32 caliber Walther. RT 6739. Hamilton said that he needed it for "backup." RT 6741. Hamilton left and returned thirty to sixty minutes later with a man named "Bob." RT 6743. At some point, they left the house. RT 6745.

Goytia left the house and went to a bar from 10:00 p.m. until 2:00 a.m. RT 6749. When she was returning to her car, Hamilton pulled up in his Buick Riveria. RT 6750. He told Goytia that her gun had been involved in a homicide, that she should report it to the police as stolen, and that her house had been messed up. RT 6766. Hamilton said that he wanted it to appear that the gun had been taken in a robbery. RT 6773. Goytia returned home and called the police and reported the gun stolen. RT 6729, 6776. She eventually told Beck and Hall that this report was untrue. RT 6734.

Two or three days later, Hamilton told Goytia that "Bob" had been shot five times and had obtained medical treatment for $1000. RT 6779–80. There had been a lot

of confusion and her gun had been dropped. RT 6780. Hamilton did not mention Lodge and identified "Wolf" as a friend. RT 6780. Goytia assumed that Hamilton had learned the details from Lodge. RT 6833. Hamilton later told her that he had not been at the shootings. RT 6808.

### 2. *Hamilton and Lodge's Other Statements*

Bridget Welsh testified that Hamilton made incriminating statements to her. RT 6932. She denied that she relayed to Goytia a detailed confession by Hamilton in which he told her that Lodge set up the shootings; that the motive was to steal money and drugs; that no one was shot before Evans returned home; that someone "freaked out and started shooting"; that no one was supposed to get hurt; and that Hamilton ran and dropped Goytia's gun. RT 6938. Beck interviewed Welsh and testified as to her statement about another incident in which Hamilton told her that he was involved in the homicides and that "[e]verything had gone haywire." RT 7355.

In June 1985, Wofford, Hamilton and Lodge were involved in an altercation with Quido D'Amico, a former police informant. RT 7050. Hamilton called out, "There is the rat," and Lodge attacked him with his chain handcuffs. RT 7065–67. Lodge said, "We murdered two assholes already, one more ain't going to make no difference." RT 7068. Hamilton, sitting nearby, smiled. RT 7116. Lodge threatened to kill D'Amico if he reported the incident. RT 7071.

Lodge also made several statements to deputy sheriffs. He told Deputy Leon Mason that his case involved a drug rip-off and that Nickerson and Wofford were not involved. RT 6877.

He told Deputy Sheriff David Angarole that the people in jail for the crime were not involved. RT 6891. He specifically referred to Nickerson and Hamilton. RT 6895.

Irene Cook testified that Lodge was the man who broke into her house with two guns the night after the murders. RT 6954–56, 6960. He showed her a two inch roll of money, RT 6960, demanded food and clothes, RT 6957, and indicated he was wanted by the police. RT 6958. He stole her car, which was later found in Idaho. RT 6959–61.

## II. *Procedural History*

After their joint trial, the jury convicted both Nickerson and Hamilton on two counts of murder and one count of attempted murder. Nickerson's appeal to the California Court of Appeal was denied in 1989 and the California Supreme Court affirmed the conviction that same year.

Lodge's separate capital trial took place after Nickerson's appeal was rejected by the California Supreme Court. During Lodge's trial, the court found that the investigating officers, Beck and Hall, engaged in serious misconduct. Finding that they manufactured evidence, destroyed exculpatory evidence and committed perjury, the judge declared a mistrial. At Lodge's second trial, Brian Tripp recanted his identification of Nickerson, testifying that he identified Nickerson because he was influenced by Beck and Hall. Lodge did not testify. He was convicted and sentenced to life without the possibility of parole.

On April 23, 1997, Nickerson filed an application for habeas relief in California Superior Court for the County of Santa Clara. Nearly a year afterwards, the Superior Court denied the petition as untimely. A few weeks later, on May 8, 1998, the California Court of Appeal summarily denied Nickerson's petition. The California Supreme Court denied his petition as untimely on December 22, 1998.

On December 28, 1998, Nickerson filed this federal habeas petition. On December 1, 1999, this court dismissed the petition as untimely. Nickerson moved for reconsideration of the dismissal. He submitted with his motion newly discovered exculpatory evidence. On September 14, 2000, the court granted the motion for reconsideration on the basis of evidence of actual innocence and held that Nickerson could proceed on the merits of his habeas petition.

On June 1, 2001, the court held that Nickerson had made a showing of extraordinary circumstances that he was likely innocent of the shootings. The court ordered Nickerson freed on bail pending the outcome of his habeas petition. On petition for writ of mandamus, the Court of Appeals ordered Nickerson to return to the custody of the state. *In re Roe*, 257 F.3d 1077 (9th Cir.2001). Nickerson voluntarily appeared in court and was taken back into custody on June 18, 2001, seven days after his release.

The court granted Nickerson's request for an evidentiary hearing on his three habeas claims. The court held hearings on January 8, 9, 10, and March 28, 2002. The parties submitted over two hundred exhibits including depositions from a number of witnesses in lieu of live testimony. After the evidentiary hearing, the parties filed evidentiary objections and subsequent post-hearing briefing. The court deemed the matter submitted and no oral argument was held.

Now before the court is Nickerson's federal habeas petition. Nickerson maintains his innocence of any involvement in the Evans murders. He claims that he was wrongly convicted due to a pattern of misconduct by the investigating detectives, who manipulated witnesses and hid exculpatory evidence, thus depriving him of a fair trial in violation of his due process rights. He also claims that he was denied effective assistance of counsel and that his counsel suffered from a conflict of interest.

*PROCEDURAL ISSUES*

As a threshold matter, the state contends that petitioner's claims are barred by the state court's dismissal of his state habeas petition as untimely. The state also contends that newly discovered evidence supporting petitioner's claims is unexhausted because it was not presented to the state court.

I. *Timeliness*

As amended by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996), the federal habeas statute imposes a one year statute of limitations on habeas petitions filed in federal courts. 28 U.S.C. § 2244(d)(1). As his conviction became final prior to the effective date of AEDPA, Nickerson was required to file his federal habeas petition by April 24, 1997, one year from the enactment of AEDPA. *Patterson v. Stewart*, 251 F.3d 1243, 1245–46 (9th Cir.2001). The time "during which a properly filed application for State post-conviction or other collateral review ... is pending shall not be counted" towards AEDPA's statute of limitations. 28 U.S.C. § 2244(d)(2).

Nickerson filed a petition for writ of habeas corpus in state court on April 23, 1997, thus tolling the statute of limitations on his federal habeas petition with only a single day left to file. After both the Superior Court of California and the California Court of Appeal denied Nickerson's petition, Nickerson filed his petition with the California Supreme Court, which denied the petition as untimely on December 22, 1998. Nickerson filed a habeas petition with this court six days later on December 28, 1998.

On December 1, 1999, this court dismissed the petition on grounds that Nick-

erson had not filed within the one year statute of limitations. On September 14, 2000, the court granted a motion for reconsideration of this ruling and held that despite failure to file within the time required by statute, Nickerson could proceed on the merits of his habeas petition based on proffered evidence of actual innocence.

■ While the court adheres to the logic of its previous order, subsequent changes in the law render Nickerson's petition timely and the issue of a miscarriage of justice exception to AEDPA's statute of limitations moot in this case. The Ninth Circuit in *Bunney v. Mitchell*, 262 F.3d 973 (9th Cir.2001) (per curiam), ruled that a habeas petition is deemed pending before the California courts until the denial of the petition becomes final under state law thirty days after the filing of the order by the California Supreme Court. *Id.* at 974; Cal.Rules of Court, Rule 24. Under this rule, the order of the California Supreme Court denying Nickerson's petition did not become final until January 21, 1999. The statute of limitations for Nickerson's federal habeas petition was tolled under section 2244(d)(2) until the next day, and would have expired two days later, on January 23, 1999. Nickerson therefore filed this petition within the statute of limitations set forth in section 2244(d)(1).

## II. *Exhaustion*

■ A habeas petition should be dismissed if the claims contained within have not been fairly presented to the state's courts in a manner allowing those courts to review the merits of those claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119

S.Ct. 1728, 144 L.Ed.2d 1 (1999); 28 U.S.C. § 2254(b)(1). In his petition for writ of habeas corpus, Nickerson presents claims for relief based on police tampering with witnesses and evidence, ineffective assistance of counsel, and conflict of interest. The state acknowledges that Nickerson presented all the legal claims contained in his federal habeas petition to the state court. The state contends, however, that insofar as Nickerson bases his due process claim on police misconduct rather than actual innocence, that claim was neither presented to the state court nor to this court in his petition.

■ The court disagrees with the state's characterization of Nickerson's claim.[9] In both the petition before this court and the petition presented to the California Supreme Court, Nickerson claimed that newly discovered evidence of police misconduct on the part of Detectives Beck and Hall both required a new trial and helped proved his innocence. *See* Petition at 3, 40–46; Petition for Writ of Habeas Corpus, ¶¶ 46, 185–226, *In re Nickerson*, No. S070204 (Cal. Dec. 22, 1998). In both petitions, the primary piece of "newly discovered evidence" put forth by Nickerson is the finding of evidence tampering and perjury by Beck and Hall in Lodge's trial. Both petitions also specifically allege that unconstitutional pressure by Beck and Hall caused Brian Tripp to misidentify the man he saw as Nickerson, a view which he later recanted. The court finds that the claim of unconstitutional police misconduct was presented to the California Supreme Court and is properly before this court.

■ The state also contends that Nickerson's claims must be dismissed be-

9. In addressing preliminary procedural issues, this court described Nickerson's petition as presenting substantive claims for relief on the basis of actual innocence. Nickerson has consistently rejected this characterization and maintained that police misconduct violated his due process rights. In subsequent argument, briefing and evidentiary hearings on the merits of Nickerson's petition, both parties have treated Nickerson's first claim as a claim of police misconduct.

cause he has not presented evidence in state court regarding the role of William Jahn as a participant in the Evans murders. In habeas proceedings, federal courts may not entertain new evidence that was never presented to the state courts and that "places the claim in a significantly different posture." *Nevius v. Sumner,* 852 F.2d 463, 470 (9th Cir.1988), *cert. denied,* 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989). New factual allegations do not render a claim unexhausted unless they fundamentally alter the legal claim already considered by the state courts. *Vasquez v. Hillery,* 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *Chacon v. Wood,* 36 F.3d 1459, 1468 (9th Cir.1994), *superseded by statute on other grounds as recognized in Morris v. Woodford,* 229 F.3d 775, 779 (9th Cir.2000).

■ Nickerson offers the details of William Jahn's participation in the Evans murders as evidence of his own innocence. Nickerson argues that while the evidence indicates that the murders were committed by only three perpetrators, the state has now convicted four individuals in the killings. Of these four, Nickerson argues, he alone has not been tied to the scene by physical evidence and was not seen with the other perpetrators that day.

The introduction of new evidence of actual innocence in Nickerson's federal petition does not raise exhaustion issues because the evidence does not relate directly to Nickerson's substantive claims of police misconduct or ineffective assistance of counsel, and so does not place those claims in a new light. Evidence of William Jahn's role does bear on Nickerson's argument that evidence of his innocence warrants reaching his substantive claims despite procedural default. The exhaustion doctrine bars only evidence that places the claims considered by state courts in a significantly different posture. *Nevius,* 852 F.2d at 470. Principles of comity do not apply where a habeas petitioner faces procedural or jurisdictional obstacles in federal court that are separate from his substantive claims and that did not exist in state court. The exhaustion doctrine does not prevent Nickerson from introducing new evidence of his innocence in his federal habeas petition in order to satisfy the miscarriage of justice exception to the doctrine of procedural default.[10]

**10.** Like the petitioner in *Vasquez,* Nickerson originally presented his petition supported only by the evidence offered in state court. *See Vasquez,* 474 U.S. at 260, 106 S.Ct. 617. Nickerson supplemented his petition with evidence concerning William Jahn's role in the murders when he learned of the prosecution of Jahn after filing his habeas petition. *See* Exh. 42, Declaration of Gerald Schwartzbach. Nickerson did not "[attempt] to expedite federal review by deliberately withholding essential facts from the state courts." *Vasquez,* 474 U.S. at 260, 106 S.Ct. 617. To the contrary, the court notes that the state chose not to disclose to Nickerson that a fourth suspect had been located whose DNA matched that in the blood trail leading away from Evans' house, facts which they discovered while Nickerson's state habeas petition was still pending. A 1994 police report contains the first mention of William Jahn as an additional suspect in the murders. *See* Resp. Exh. BB, City of San Jose Police Memorandum, dated Dec. 5, 1994. After Jahn was arrested in 1997 on unrelated charges, the Santa Clara District Attorney's Office in November 1998 requested that blood samples taken at the time of his arrest be tested against the blood from the scene of the Evans murders. Exh. 179, Report of Santa Clara District Attorney's Office Investigator Ray Medved, dated Nov. 23, 1998. The DNA in the blood samples from Jahn matched that in blood found at the crime scene. Exh. 182, Affidavit of Ray Medved, at 3–4. Jahn also exhibited scars and metal fragments in his body consistent with eyewitness accounts of the gunshot wounds inflicted on one of the perpetrators. *Id.,* at 4.

Despite Nickerson's pending habeas petitions before the state courts and then before this court, no officer of the state of California ever notified Nickerson's counsel of the investigation into Jahn's role in the Evans mur-

892

### III. *Procedural Bar*

The California Supreme Court summarily denied Nickerson's petition with a citation to *In re Robbins,* 18 Cal.4th 770, 780, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998), a case in which the court set forth the framework for its analysis of timeliness of habeas corpus petitions. Under Ninth Circuit law, this constitutes a denial only on the procedural ground of untimeliness. *See Hunter v. Aispuro,* 982 F.2d 344, 348 (9th Cir.1992) (where a summary denial by the California Supreme Court includes a citation to state authority indicating that the habeas petition was procedurally deficient, the order represents a procedural disposition rather than a decision on the merits), *cert. denied,* 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). The state argues that this dismissal on timeliness grounds constitutes an adequate and independent state law ground for decision. Petitioner maintains that the timeliness bar set forth in *Robbins* is not truly independent of federal law. In the alternative, petitioner argues that this court should reach the merits of his petition to avoid a fundamental miscarriage of justice.

 It is a basic rule of federal jurisdiction that the Supreme Court, on direct review of a state court judgment, has no power to review a question of federal law if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Fox Film Corp. v. Muller,* 296 U.S. 207, 210, 56 S.Ct. 183, 80 L.Ed. 158 (1935). This rule applies to state law decisions which rest on procedural grounds as well as to those that rest on substantive grounds. *Henry v. Mississippi,* 379 U.S.

443, 446, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

 Federal courts also apply the adequate and independent state grounds doctrine while reviewing the lawfulness of a prisoner's confinement on petition for writ of habeas corpus. *Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In the habeas context, the application of the independent and adequate state ground doctrine is not jurisdictional but is instead grounded in concerns of comity and federalism. *Id.* The doctrine of procedural default is a specific application of this more general adequate and independent state grounds doctrine, under which a federal court generally will not grant habeas relief on a claim that a state court declined to address because the petitioner failed to meet a state procedural requirement. *Fields v. Calderon,* 125 F.3d 757, 762 (9th Cir.1997), *cert. denied,* 523 U.S. 1132, 118 S.Ct. 1826, 140 L.Ed.2d 962 (1998). Federal courts may review procedurally defaulted claims, however, if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

#### A. *Adequacy and Independence*

 Nickerson first argues that the timeliness bar applied by the California Supreme Court is not independent of federal law. "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with

ders. Declaration of Gerard Schwartzbach, dated Nov. 15, 1999, ¶ 51. Nickerson's counsel received word of the case against Jahn from an outside source and interviewed Jahn in prison shortly afterward, on November 11,

1999. *Id.* ¶¶ 7–10. Nickerson's counsel filed a declaration with this court outlining the state's investigation and his own interview with Jahn four days later. *See id.*

federal law." *LaCrosse v. Kernan,* 244 F.3d 702, 704 (9th Cir.2001) (citing *Michigan v. Long,* 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). In *Bennett v. Mueller,* 322 F.3d 573 (9th Cir. 2003), the Ninth Circuit ruled that the denial of a habeas petition based on the timeliness bar set forth in *Robbins* rests on state law grounds that are independent of federal law. *Id.* at 578. The *Bennett* court, however, remanded for a determination whether the timeliness bar was sufficiently "well-established and consistently applied" at the time the default occurred to qualify as an adequate state procedural ground. *Id.* at 578; *see also Poland v. Stewart,* 169 F.3d 573, 577 (9th Cir.) ("A state procedural rule constitutes an adequate bar to federal court review if it was firmly established and regularly followed at the time it was applied by the state court."), *cert. denied,* 528 U.S. 845, 120 S.Ct. 117, 145 L.Ed.2d 99 (1999). While placing the ultimate burden of proving adequacy with the state, the court ruled that petitioner must place the state's affirmative defense of independent and adequate state procedural grounds at issue "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure." *Id.* at 584–85. Nickerson has not challenged the adequacy of the asserted timeliness bar and therefore has not met his burden under *Bennett.*[11] The court must therefore assume that the denial of Nickerson's state habeas petition rested on an adequate as well as independent state law ground.

**B.** *Miscarriage of Justice Exception to Procedural Default*

1. *Legal Standard*

The Supreme Court set forth the miscarriage of justice standard most recently in *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), as a limited exception to the application of procedural default for those cases in which the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327, 115 S.Ct. 851.[12] Although this requirement has been referred to as a showing of 'actual innocence,' it is distinct from the freestanding innocence claim discussed by the Court in *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). The claim of innocence under *Schlup* is not a substantive one which, if proven, would entitle the petitioner to relief from custody, but is instead "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup,* 513 U.S. at 315, 115 S.Ct. 851 (quoting *Herrera,* 506 U.S. at 404, 113 S.Ct. 853); *Sistrunk v. Armenakis,* 292 F.3d 669, 673 (9th Cir.2002) (en banc), *cert. denied,* —— U.S. ——, 123 S.Ct. 874, 154 L.Ed.2d 792 (2003).

In *Schlup,* the Supreme Court clarified the showing of innocence necessary for a court to review the merits of procedurally barred claims. The Court held that a petitioner must demonstrate that "it is more likely than not that no

---

**11.** Neither party has addressed the adequacy of the *Robbins* bar as applied to Nickerson's default, no doubt in part due to the fact that *Bennett* was decided after the completion of briefing in the present action. Because the court reaches the merits of Nickerson's petition despite treating the state court decision as a procedural bar, Nickerson has not been prejudiced by application of the *Bennett* rule without further opportunity for briefing.

**12.** The *Schlup* court affirmed the existence of the miscarriage of justice exception for a prisoner sentenced to death. The Ninth Circuit has subsequently inquired into the exception in noncapital cases as well. *See Sistrunk v. Armenakis,* 292 F.3d 669, 672 n. 3 (9th Cir. 2002) (en banc), *cert. denied,* —— U.S. ——, 123 S.Ct. 874, 154 L.Ed.2d 792 (2003); *Paradis v. Arave,* 130 F.3d 385, 389, 396 (9th Cir.1997).

reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Id.* at 326–27, 115 S.Ct. 851. In order to make this showing, a petitioner must "support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324, 115 S.Ct. 851. The Ninth Circuit has held that "where post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to pass through the *Schlup* gateway to allow consideration of otherwise barred claims." *Sistrunk,* 292 F.3d at 673 (citing *Carriger v. Stewart,* 132 F.3d 463, 478–79 (9th Cir.1997) (en banc), *cert. denied,* 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998)). Accordingly, "a petitioner may pass through the *Schlup* gateway by promulgating evidence that significantly undermines or impeaches the credibility of witnesses presented at trial, if all the evidence, including new evidence, makes it more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Gandarela v. Johnson,* 286 F.3d 1080, 1086 (9th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 882, 154 L.Ed.2d 795 (2003).

## 2. *Analysis*

In support of Nickerson's claim of innocence, he introduces three types of evidence. First, he introduces substantial evidence undermining the prosecution's case against him, including the recantation of the prosecution's most reliable eyewitness, impeachment evidence, as well as evidence of witness tampering that forms the basis of his misconduct claim. Next, Nickerson introduces evidence of the conviction of William Jahn in 2001 for the murders which he argues were committed by only three perpetrators. Finally, Nickerson offers a detailed history of how the other three men convicted of the crime have without a single exception declared Nickerson innocent, despite admitting their own guilt and inculpating each other on numerous occasions.

### i. *Subsequent Evidence Contradicting the Prosecution's Case*

 No physical evidence linked Nickerson to the Evans murders. The bulk of the evidence on which Nickerson was convicted consisted of the testimony of four witnesses: Brian Tripp, Judy Bryant, Michael Osorio and Sharon Silberhorn. The prosecution's case relied, therefore, on the credibility of those witnesses and the credibility and integrity of the detectives who guided eyewitnesses through the process of identifying Nickerson. Nickerson first offers evidence that contradicts and impeaches the trial testimony of the two most inculpatory witnesses, Brian Tripp and Judy Bryant.

### a. *Brian Tripp*

At Nickerson's trial, Brian Tripp gave the most credible eyewitness account which placed Nickerson at the scene of the crime. In contrast to the histories of drug use or criminal conduct of other witnesses such as Michael Osorio and Judy Bryant, Tripp testified while employed as a deputy sheriff. Unlike Osorio, who observed the attackers while they were wearing ski masks and while he was lying handcuffed on the floor, Tripp observed the man he identified as Nickerson without a mask at distances between four and fifteen feet. Tripp observed the man for a reasonable period while the man stood bewildered in Tripp's parking area, turned and asked Tripp directly where he was, and allowed Tripp to reply before running off. Tripp testified that his certainty that the man he saw was Nickerson was "nine out of ten."

By the time Brian Tripp testified again in the 1992 trial of Murray Lodge, he had worked as a deputy sheriff for six years. LT1 7977. Under oath and in open court, Tripp unequivocally recanted his previous testimony and affirmatively stated that the man he saw "was nowhere near the size Buddy Nickerson is." LT1 7998–99, 8002–03. Tripp affirmed his original identification of a man about five feet eleven inches to six feet tall and weighing 190 to 200 pounds, with darker straight hair and a moustache to the corners of his mouth. LT1 8002–03. Tripp testified that the questioning conducted primarily by Beck and Hall led to his misidentification of Nickerson. LT1 7999–8000, 8018–19.

In *Carriger v. Stewart,* the Ninth Circuit considered the recantation and confession of a government witness in finding that petitioner had satisfied the showing of innocence required by *Schlup,* where the recantation bore indicia of reliability. 132 F.3d at 474–75, 478 (relying on the recanted testimony of a government witness where recantation was against penal interest, confession contained details which only perpetrator was likely know, and amended testimony fit with other evidence in the case).

Tripp's recantation likewise bears certain hallmarks of reliability. Tripp's testimony in the Lodge trial confirms the descriptions he initially gave to police. The fact that Tripp's original identification matches Jahn fits with the newly discovered DNA evidence pointing to Jahn as the bleeding runner that fled through Tripp's apartment complex. Finally, Tripp's explanation for his identification of Nickerson at trial—that he was pressured by police investigators—comports with the other evidence presented by Nickerson and credited by this court that Detectives Beck and Hall engaged in a pattern of misconduct throughout the investigation of the case.

The court also notes that many of the reasons to distrust recanted testimony are absent here. Unlike a testifying codefendant or a jailhouse informant who may often recant testimony, Tripp has no loyalty to Nickerson nor fear of being labeled a snitch. Quite the opposite is true—as a law enforcement officer, Tripp no doubt has more to lose by recanting his identification than by adhering to it. In contrast to an ordinary citizen, Tripp should be accustomed to participating in the criminal justice system as an agent of the state. There is no reason to think that the gravity of his role as a key witness for the prosecution would cause him to entertain false doubts about his testimony. The court credits Tripp's recantation and finds that, for purposes of the present inquiry, it fully negates the testimony identifying Nickerson he gave at Nickerson's trial.

### b. *Judy Bryant*

Judy Bryant's account of highly inculpatory statements made by Nickerson in the van ride soon after the murders provided perhaps some of the prosecution's strongest evidence in Nickerson's trial. Because much of Bryant's testimony at Nickerson's trial completely surprised the defense, she was subjected to little cross-examination. She has subsequently been thoroughly impeached by evidence not put forth at Nickerson's trial.

Judy Bryant testified again at Lodge's trial about the van ride in which Nickerson allegedly made incriminating statements. She testified contrary to her testimony in Nickerson's trial that the van ride occurred a few hours after the shootings rather than a full day. LT1 9684–85, 9710–11, 9717.

Bryant was impeached in the Lodge trial by her then-husband, Kelly Bryant, who testified that she was a regular methamphetamine and cocaine user and that she had been drinking heavily and using meth-

amphetamine on the day the van ride occurred. LT1 12430, 12457. Mr. Bryant also testified that she abused alcohol, drinking "whenever she had money", and that when drunk, she often told "tall tales" or "whoppers." [13] LT1 12444–46, 12455. He testified that when challenged she refused to admit the untruth of her stories. LT1 12407–08.

Her husband also testified that Judy Bryant told him that Nickerson said that he tortured and molested Evans before killing him. LT1 12428–29; Exh. 17. There is no evidence that Evans was tortured or sexually assaulted.

Bryant was also impeached at Lodge's trial by Detective Hall. According to Detective Hall's notes from his first interview with Bryant, she mentioned being with Nickerson on the early morning of September 16 and told Hall about the statements Nickerson made in his phone call to his mother. LT1 10670–71, 10788; Exh. 15. She did not mention the inculpatory statements made on the van ride. *Id.*

Jack Ball and Mick Cleveland, two other participants in the van ride, recounted the van ride differently. Jack Ball told investigators that during the van ride Judy Bryant accused Nickerson of being involved in the shootings and that Nickerson emphatically denied any involvement. Exh. I. Ball denied that Nickerson made the statements Bryant attributed to him. *Id.* At Lodge's trial, Cleveland testified that he did not remember any unusual conversation in the van ride. LT1 12005–08.[14]

In addressing Nickerson's state habeas petition, Judge Edward F. Lee remarked, "[T]his court certainly concedes that Judy Bryant could have been more thoroughly cross-examined by petitioner's trial counsel and her testimony effectively repudiated ...." *In re Nickerson,* No. 99023, at 12 (Cal.Super.Ct., Apr. 8, 1998). The court agrees, finding that the ever-shifting nature of her accounts, the evidence of regular substance abuse and deceit, as well as the directly contradictory testimony of other witnesses and participants effectively undermines Judy Bryant's testimony regarding Nickerson's van ride confession.

ii. *The 2001 Conviction of William Jahn for the Evans Murders*

After Nickerson filed the present action in this court, the State of California tried and convicted a fourth man, William Jahn, for the murders of Evans and King and the attempted murder of Michael Osorio. At Jahn's trial, Norma Goytia identified him as the man "Bob" who was with Hamilton when Hamilton took Goytia's gun, which was later found at the crime scene. Exh. 64 at 1512–13. Jahn weighed between 190 and 200 pounds and stood between five feet eleven inches and six feet tall, 4 EHT 58, thus matching the physical description witnesses, including Brian Tripp, saw fleeing the scene. DNA tests performed by the Santa Clara District Attorney matched the blood trail leaving the scene of the crime to Jahn. Pet. Traverse, Exh. 6 (Santa Clara Crime Laboratory Report No. 04, dated May 16, 2001 and No. 05, dated May 31, 2001). DNA testing also showed that blood on a Playtex glove found near the crime scene belonged to Jahn, and that Jahn was a possible match for the blood on the tip of a rubber glove at the crime scene. *Id.* Two women treat-

---

**13.** As examples, Kelly Bryant testified that his wife had told him that she could read people's minds, LT1 12407, that she had been cured of tuberculosis of the bone after being kidnapped by a UFO, LT1 12409–10, and that she and her brother had once run over a hitchhiker, decapitating him so that his head bounced off the windscreen, LT1 12408–09.

**14.** The court notes this evidence but affords it no weight given the contradictory accounts of these two witnesses.

ed Jahn for gunshot wounds on the night of the killings. Pet.'s Traverse, Exh. 8 & 9. Jahn's body bears the scars of several bullet wounds which still contain traces of metal. Pet. Traverse, Exh. 7. Jahn admitted to his ex-wife that he was shot when he went to a home to steal drugs. Exh. 59, 60, 61. Jahn confessed to his role in the murders to Nickerson's counsel and described the events in detail. 4 EHT 52–64. Jahn was charged with the Evans–King murders and the shooting of Osorio in 1999 and was convicted in September 2001.

### iii. *Exoneration of Nickerson by Lodge, Hamilton, and Jahn*

As further proof of his innocence, Nickerson presents evidence indicating that during the seventeen years since the murders, the other convicted co-defendants have repeatedly exonerated Nickerson. At the evidentiary hearing, Nickerson presented the testimony of Murray Lodge, in which Lodge described the Evans murders in great detail and exonerated Nickerson. Nickerson does not rest solely on Lodge's statements, but offers a variety of evidence other than Lodge's testimony. He introduces testimony and depositions from Lodge's family, other inmates, and even Lodge's former attorneys that illustrate that Lodge has uniformly maintained Nickerson's innocence in situations in which he which he would have no motive to lie. Finally, Nickerson presents evidence that Jahn and Hamilton have made statements exonerating him.

### a. *Prior Exonerations by Lodge*

Nickerson first introduces testimony by a number of Lodge's prior attorneys, family, and fellow inmates, who each testified that Lodge repeatedly told them that he committed the crimes with Hamilton, Jahn, and Wofford, and that Nickerson was not involved.

The court admitted the deposition testimony of Charles Constantinides, Lodge's counsel from approximately December 1984 until March of 1987, and currently a Santa Clara County Deputy District Attorney.[15] Exh. 49 at 6–8. Constantinides testified that Lodge consistently told him that Nickerson was innocent of the crimes, Exh. 49 at 44, and that Lodge, Hamilton, and an unnamed man who was shot at the scene were responsible for the shootings. Exh. 49 at 19–20, 21, 34–40, 50–51. Constantinides witnessed two violent assaults in which Lodge attacked Nickerson. Exh. 49 at 17–19. After the assaults Lodge spoke to Constantinides about Nickerson, saying "I would never associate with that guy. He's stupid and a snitch, and he can't be trusted, and I would never do anything like this with a guy like that. Just absolutely not." Exh. 49 at 44. However, Lodge told him "over and over again" that even though he hated Nickerson, "there was no reason for a guy to go down on a murder, because he [Nickerson] didn't—he didn't have a part in that." Exh. 49 at 44.

The court admitted the deposition testimony of Christopher Edward Taffe, who succeeded Constantinides as Lodge's lead counsel in his case. Exh. 50 at 6–7. From 1987 until 1990, Lodge and Taffe had repeated conversations about the details of the crime. Exh. 50 at 8. On many occasions Lodge told Taffe that he committed the crime with Hamilton, Wofford, and a man named "Bob." Exh. 50 at 8. He also repeatedly told Taffe that "Buddy Nickerson played absolutely no role in the planning of the crime" and that "Buddy Nickerson had no knowledge of the crime." Exh. 50 at 9–10. Taffe testified as to the account that Lodge gave him of the events

15. Constantinides testified only after Lodge waived any conflict of interest, the court issued an order compelling him to do so and a subpoena was served requiring his appearance. Exh. 49, 10:18–23.

of that evening. Exh. 50 at 12–33. The detailed account is consistent with the account Lodge gave in his testimony.

Martine Culet testified on March 28, 2002. Culet assisted Constantinides in representing Lodge. 4 EHT 40. She testified that Lodge told her that he, Hamilton, and someone named "Bob" broke into Evans house and committed the crimes. 4 EHT 31–32. He also repeatedly told her that Nickerson "was in no way involved in this crime." 4 EHT 33.

Barbara Olivotti, Lodge's sister, testified on March 28, 2002. She testified that she had never met Nickerson or any of Nickerson's family. 4 EHT 27. Lodge previously told her that Nickerson was not involved in the crime. 4 EHT 18–19. He later sent her the cover article from California Lawyer Magazine with reported statements from Nickerson's counsel and others that Nickerson was innocent. 4 EHT 18–19; Exh. 39. Olivotti asked Lodge if the article was true. 4 EHT 20. Lodge confirmed that Nickerson had nothing to do with the crime. 4 EHT 20. Olivotti "was just absolutely appalled" and encouraged Lodge to so something to help Nickerson. 4 EHT 21.

The court admitted the deposition testimony of Peter Ming Fan, an inmate at California State Prison, Solano County, in lieu of his live testimony. Exh. 48 at 10. Fan is serving a sentence of life without the possibility of parole for murder. Exh. 48 at 10. Fan was an inmate in the Santa Clara County Jail between 1984 and 1986. Exh. 48 at 10. At one point he was housed near Nickerson. Exh 48 at 48. Nickerson proclaimed his innocence to Fan and "anyone ... willing to listen." Exh. 48 at 48–49. Fan thought nothing of it because many people in jail say that they are innocent. Exh 48 at 49–50. At some later point, Fan was housed with Lodge. Exh. 48 at 10. Lodge told him that he was guilty of the crimes for which he was convicted but that Nickerson was "completely innocent." Exh. 48 at 10–11. Lodge said that the cops had screwed up and that Nickerson had nothing to do with it. Exh. 48 at 33–34. This statement caught Fan's attention because Nickerson had told him the same story. Exh. 48 at 34–35. Fan testified that this was the first and only time in sixteen years that an inmate had told him that one of his codefendants had nothing to do with the crime, and "[t]hat's why it kind of stuck." Exh. 48 at 52, 58–59. When Fan and Hamilton were inmates together at the California prison known as "Old Folsom," Hamilton told Fan that Nickerson had nothing to do with the murders. Exh. 48 at 11, 19–20, 43–44.

There does not appear to be any possible advantage for Fan in testifying that Lodge had told him that Nickerson was innocent. Fan stated that he did not "want to be a part of this," but that he was testifying "[b]ecause if Buddy Nickerson didn't do it, then he has suffered more than any human should have, being in prison for 17 years—15, 17 years for something he didn't do." Exh. 48 at 54–55. Fan was given no promises in exchange for his testimony and has had no contact with Nickerson or his family. Exh. 48 at 12, 23, 48. Fan has also had no contact with Lodge or Wofford other than his time in Santa Clara County Jail. Exh. 48 at 13–14. His only additional relationship with Hamilton was that they greeted each other three or four times when they were both inmates at the state prison in Vacaville. Exh. 48 at 14–15.

The court also admitted the deposition of Scott Wagner, an inmate at the California State Prison, Sacramento. Exh. 46 at 6. He is serving a twenty-one year sentence for robbery. Exh. 46 at 6. The court admitted his deposition transcript in lieu of live testimony. Wagner was housed in the Santa Clara County Jail in the 1980s while Murray Lodge was an inmate there. Exh.

46 at 10. Lodge told Wagner that he committed the crimes with Hamilton and a third man who was shot. Exh. 46 at 13–14. Lodge also told Wagner that Nickerson was not involved in any way. Exh. 46 at 14–15. Lodge confirmed that he hated Nickerson. Exh. 46 at 41. Wagner was a friend of Nickerson and his brothers, although Wagner has not maintained contact with Nickerson or any of his relatives. Exh. 46 at 18, 16. When he read an article in 2001 about Nickerson being released on bail, he asked his sister to contact Nickerson's attorneys. Exh. 46 at 21–22.

### b. Testimony of Murray Lodge

Murray Lodge testified at the evidentiary hearing held by this court on January 10, 2002. According to Lodge's testimony, he, Dennis Hamilton and William Jahn were responsible for the shootings and Nickerson was not involved. 3 EHT 8. Lodge testified that the motive behind the break-in was to steal drugs, money, and precious metals. 3 EHT 10–11. Lodge also testified that unbeknownst to his accomplices, he intended to kill Evans. 3 EHT 10. Lodge stated that he shot Evans in retaliation for an event where Evans held a gun to his head and accused him of being involved in Nicky Nickerson's break-in at Evans' house. 3 EHT 12. Lodge described in great detail how he, Hamilton, and Jahn broke into Evans' house and committed the crimes charged.[16]

The state attacks Lodge's credibility on two main grounds. First, the state points to Lodge's undeniably long and violent criminal history.[17] Second, the state presented evidence that Lodge previously

---

**16.** Lodge described the crime as follows. Lodge, Hamilton, Jahn and Brett Wofford planned the break-in. 3 EHT 10. Jahn and Wofford had argued earlier and Jahn refused to participate if Wofford was present. 3 EHT 9. Lodge told Wofford he could not go with them. 3 EHT 9.

Lodge, Hamilton and Jahn used a friend's van to reach the crime scene. 3 EHT 13. They parked the van a few blocks from Evans' house and walked down the side to the back of the house. 3 EHT 14. The men entered the rear of the house. 3 EHT 15. While Jahn kicked in the door to a converted garage where Mickie King lived, Lodge kicked in a door to the interior of the house. 3 EHT 16. King was brought into the living room and made to lie on the floor next to Osorio. 3 EHT 17. Both men were handcuffed and questioned about Evans' location. 3 EHT 17, 19. When Lodge heard Evans approach the house, he struck both Osorio and King on the head so that they would not call out. 3 EHT 19.

When Evans arrived home, Lodge signaled Jahn to open the door and pull Evans into the house. 3 EHT 18. Evans and Jahn struggled and shots rang out. 3 EHT 18. Jahn called out Lodge's name and asked for help. 3 EHT 18–19. Lodge ran over and shot Evans in what he thought was the side of his body. 3 EHT 18–19. After Evans fell, Hamilton and Jahn ran out the front of the house and down the street. 3 EHT 20.

Because Lodge was uncertain if King or Osorio had heard his name mentioned, he shot both men in the head as they were handcuffed. 3 EHT 19. He returned to the porch, took money and drugs from Evans, and seeing that he was still alive, shot him in the head. 3 EHT 19–20. Lodge ran out the back, through the backyard and climbed a fence into a parking lot of a nearby apartment complex. 3 EHT 20. He eventually arrived at the van. 3 EHT 20–21. Lodge was not certain if Jahn and Hamilton were already in the van when he arrived. 3 EHT 21. Lodge drove the van away from the scene down Union Street toward Blossom Hill. 3 EHT 31.

While in the van, Lodge learned that Jahn had been shot and wanted medical attention. 3 EHT 22. He also learned that Hamilton had dropped the .32 caliber pistol that he had taken from Norma Goytia's house. 3 EHT 22. Hamilton wanted to return to retrieve the gun. 3 EHT 23. Lodge refused, took remaining weapons and left on foot into the mountains where he broke into the home of an elderly woman and stole her car. 3 EHT 23–24.

**17.** In addition to the Evans murders, Lodge admitted to committing several armed robberies and burglaries. 3 EHT 44–45.

made other statements exonerating not only Nickerson, but Hamilton, Wofford and Jahn, as well. The state argues that these prior statements rob Lodge of all credibility and show only that Lodge will say anything to help his codefendants.

Lodge has previously claimed that neither Hamilton nor Jahn participated in the murders, a statement his present testimony contradicts. In 1999, Lodge signed a statement prepared by Hamilton's attorney exonerating Hamilton and Wofford, which he now admits was false. 3 EHT 28–31, 60. Later that year, Lodge told an investigator from the Santa Clara district attorney's office that neither Nickerson nor Hamilton helped him commit the crime, and that he did not know William Jahn. 3 EHT 31–33. Lodge made similar statements as long ago as Nickerson's trial, in which the state introduced evidence that Lodge had at various times told various police officers that Nickerson, Hamilton, and Wofford were not involved in the crimes. RT 6877–78, 6882, 6892–6907. Lodge testified that over the years, he had tried to help Wofford, Hamilton and Jahn by lying about their involvement in the crime. *E.g.*, 3 EHT 25–26. Lodge felt bad about the fact that he had deceived them into getting involved in the crime and because he was the only one who had actually shot the victims. 3 EHT 26; Exh. 46 at 44–45. It is clear that he lied about their involvement in the crime when he thought it would assist them.

Based on the history of deceit that the state recites, a bare assertion by Lodge that Nickerson was not involved in the crime could be dismissed as entirely without credibility. However, several factors provide substantial support for the truth of Lodge's present account. Most importantly, Lodge made statements exonerating Hamilton and Wofford only to authorities under circumstances where he believed his statements would help them. Lodge

would have no such belief that he could help (or harm) his codefendants through statements made to his own counsel. Over the past eighteen years, in those situations in which Lodge had no motive to lie, he repeatedly admitted that Hamilton, Wofford, and another man were involved, while he without exception denied that Nickerson played any part in the crimes. He described Hamilton's participation in the crime even to his first counsel, before Hamilton's first trial began, and he continued to make private statements implicating Hamilton while Hamilton's trial and appeal were pending.

Lodge also gave accounts of the crime to his sister and to other inmates which exonerated Nickerson. The state points out that Lodge told fellow inmate Scott Wagner that he was trying to take responsibility for the murders on himself in order to help his codefendants. Exh. 46 at 44–45. Even as he told Wagner this, however, Lodge informed him that Hamilton and another man helped him break into Evans' house, but that Nickerson was not involved. Exh. 46 at 13–14.

Although the state maintains Lodge would say anything to help his codefendants, the evidence in the record indicates that Lodge dislikes Nickerson and has placed himself in danger by implicating Hamilton and Jahn. Lodge twice assaulted Nickerson when they were both awaiting trial, once assaulting Nickerson with his shackles in a jury deliberation room and once attacking Nickerson in open court until he was clubbed down by the bailiff. 3 EHT 111–12. Lodge engaged in these assaults in part because Nickerson had been "telling on people." 3 EHT 111–13. After his arrest, Nickerson was interviewed by the police and took a polygraph test. 3 EHT 112–13. Lodge and others obtained transcripts of a police interview and polygraph test of Nickerson that Lodge said revealed Nickerson was giving

information to the police about "anybody and everybody that did anything wrong for the last twenty years." 3 EHT 112–13. Lodge stated that even prior to this revelation, he never liked Nickerson and was embarrassed to be associated with him in the same crime. Ex. 49 at 44 (statements made to Lodge's first lawyer Charles Constantinides); 3 EHT 111–112.

Lodge also testified that by identifying Hamilton and Jahn as perpetrators, Lodge was becoming a snitch and potentially putting his life at risk in jail. 3 EHT 39. When asked why he would endanger his life for Nickerson, Lodge explained,

> Well, it was a hard decision, but I had thought about it. And I thought about it more in the last two or three years than I had ever thought about it in the beginning, that ruining another man's life and putting him in prison for something he didn't do is worse than me worrying about my life and what's going to happen to me. It's time for him to get a fair shake. And as for me, well,

you know what, I ruined more than just his life. I ruined plenty of people's lives. And it's time for me to come clean and try and straighten out the whole mess, no matter what it takes. 3 EHT 40. Lodge testified that he was aware that Jahn had an appeal pending and was unaware that Hamilton's habeas petitions had been denied. 3 EHT 107, 113.

The court is aware that Lodge's record and prior deceit caution giving credence to his testimony. However, the court had an opportunity to observe him over several hours during his testimony in this petition, testifying in a court-type proceeding at his place of custody under rigorous cross-examination. The court finds Lodge to be a credible witness. He had a composed demeanor and presentation and was not evasive when pressured or questioned about inconsistent statements. The court also finds credible Lodge's explanations of his prior false statements and his failure to testify on Nickerson's behalf sooner.[18]

---

**18.** Lodge was not surprised when Nickerson was arrested after the shootings. 3 EHT 26. There were rumors circulating that Nickerson had "run his mouth." about getting revenge for the shooting of his brother Nicky. 3 EHT 26–27. Lodge hoped that Nickerson would be blamed for the murders and for the first few years thought it was pretty funny that Nickerson was in custody for so long. 3 EHT 27. Lodge assumed that Nickerson would be found innocent at trial. 3 EHT 27.

Referring to out-of-court statements he made and the declarations he signed, Lodge stated:

> Well, you can call it lying, if you want, but what I've been calling it all these years is refusing to implicate others for my safety. By implicating others it just would have been rougher time and harder for me to do the life-withouts [sentences] that I have to do. But day in and day out I have thrown that caution and that worry to the wind, because I think it's only fair that this man not die in prison. I deserve to die in prison. You know, I did what I did. I got to

face the music. But he didn't do anything. He didn't know anything about it. And I know he's innocent. Now, whether people believe because I have told the truth on others and signed declarations because I didn't want them to not be able to fight their case by me imposing and keeping them from their appellate rights and getting a fair shake, sure I wish I wouldn't have signed any of this now. Because every time I do something, it seems like this guy [Nickerson] gets burned every time. And now I think it's the only time that he gets a fair shake and gets found innocent of what he is innocent. He knew nothing of the crime before.

3 EHT 41. Lodge testified that he had not exculpated Nickerson earlier because he would have to identify the other perpetrators and put his life in jeopardy. 3 EHT 105.

> And see, I'm not thinking about that anymore. I'm thinking that you know what, if I die in prison, that is a just sentence. Because I did what I did . . . .
>
> . . . . I'm sure I have said a lot of things that caused even more complications and fric-

Lodge has nothing to gain from testifying in favor of Nickerson. His testimony will not gain him any favors with the state or correctional officers. It will not spare him retaliation from other inmates. And he has had a longstanding animosity toward Nickerson. Finally, his testimony is consistent with other reliable evidence before this court.

### c. Exonerations by Hamilton and Jahn

The court admitted the deposition transcript of Hamilton's ex-wife, Norma Goytia Rodoni, who testified for the prosecution at the trial of Nickerson and Hamilton. Exh. 57 at 4. Hamilton and Lodge were living with Rodoni at the time of the Evans shootings. LT1 9784–85. Her .32 caliber handgun was taken without her permission and left at the crime scene. Exh. 57 at 9. Rodoni's deposition reaffirms her prior testimony at Nickerson's trial, at Lodge's trial and at Jahn's trial. Exh. 57 at 6–10. She describes statements by Hamilton in which he inculpates himself and "Bob" and exculpates Nickerson. Exh. 57 at 5–7. She also reaffirms her identification of Jahn as a the man who was with Hamilton the day of the shootings. Exh. 57 at 5.

Edward Sousa, one of Nickerson's attorneys in this action, testified at the evidentiary hearing on March 28, 2002, regarding an interview with William Jahn. Sousa testified that on November 11, 1999, counsel for Nickerson interviewed William Carl Jahn at High Desert State Prison, prior to his trial for his role in the Evans murders. 4 EHT 52–53. Counsel introduced themselves, explained that they previously represented Lodge and now represented Nickerson. 4 EHT 54. Counsel told Jahn that his DNA matched the blood at the scene of the crime and he could not deny being present. 4 EHT 54. Counsel asked Jahn if he would tell the truth about who participated in the crime and if he would say that Nickerson was innocent. 4 EHT 54–55, 63–64.

Jahn said that he saw John Evans being shot and killed. 4 EHT 55. Jahn said that he had only heard of the Nickersons and had never met Buddy Nickerson. 4 EHT 55. He said he could not understand how Nickerson had been convicted because Nickerson was innocent. 4 EHT 56. Jahn also stated that the persons who were in the prison for the crime deserved to be there with the exception of Nickerson. 4 EHT 56. Jahn also responded to the information that Nickerson had turned down a plea deal for an eight year sentence with the comment that because Nickerson was innocent, he should not have taken the deal. 4 EHT 56.

Jahn then asked counsel if everything he said could be used in court against him. 4 EHT 57. Counsel told him that it could. 4 EHT 57. Jahn then said that everything he had said was said hypothetically. 4 EHT 57. For the remainder of the interview, he spoke about everything as hypothetical or from what he had heard "on the streets." 4 EHT 57. Jahn stated that seeing John Evans being shot was "emblazoned in his hypothetical mind." 4 EHT 57. Jahn also confirmed that he was 190 to 200 pounds and between five feet eleven inches and six feet tall and matched the initial physical description of one of the men leaving the crime scene. 4 EHT 58.

tion to the case. Oh, I'm positive of that. I've done lots of things that I shouldn't do. And every time I do something this man has to pay for it, Buddy Nickerson. And to me, that's not fair. And I'm—you know, I'm getting older to where I'm coming to the realization that all the things that I did was really wrong. I mean, way wrong. And this is the only way I can correct it. Whether it comes out like that or not, I have to at least make an attempt. For my own sanity.

3 EHT 106–07.

iv. *New Evidence of Guilt: Testimony of Anthony Villalba*

Timothy Flores Villalba testified for the state at the evidentiary hearing on March 28, 2002. Villalba is currently serving a sentence of twenty-five years to life for murder and robbery. 4 EHT 146–57. Villalba was an inmate at the Santa Clara County Jail in the 1980s while Nickerson was there. 4 EHT 94. He knew Nickerson's brother Nicky from the streets and his involvement in drugs. 4 EHT 95–97. He testified that after Nickerson was placed a few cells away from Villalba in 1984, Villalba began to talk with Nickerson frequently. 4 EHT 98–99.

Villalba testified that during their visits, Nickerson told him about his case. 4 EHT 100. Villalba testified that Nickerson was "boastful" and admitted to Villalba that he was one of the perpetrators. 4 EHT 101–02. According to Villalba, Nickerson explained that he, Lodge, Hamilton and another man, possibly "Billy Jahn" were responsible. 4 EHT 102–03. Villalba stated that Nickerson told him that the plan was to rob Evans of drugs and money and that there was no plan to kill anyone. 4 EHT 109. Nickerson "had just gone along to, as another gun in the, how would you explain it, to assist in the robbery, but he had his own ulterior motive for going." 4 EHT 112. Nickerson intended to retaliate for the shooting of his brother. 4 EHT 109.

Villalba testified that Nickerson had described the events of the evening as follows. Evans, Osorio, and King were in the house when the perpetrators arrived. 4 EHT 109–10. Lodge searched the house for money and drugs while the others held the house's occupants at bay. 4 EHT 110. At that point, Nickerson shot Evans. 4 EHT 110. Hamilton called out to Lodge by name. 4 EHT 111. Lodge shot the other two victims to prevent them from identifying him and everyone fled. 4 EHT 114. Nickerson told Villalba that he left the scene in his own van or truck. 4 EHT 115.

Like other witnesses in this matter, Villalba has an extraordinarily violent past and admits to a long history of lying and being deceitful when he found it advantageous.[19] 4 EHT 134–37. Unlike other witnesses, Villalba has already been labeled a snitch and so has little to lose by inculpating other inmates. Villalba left the prison gang Nuestra Familia in the early 1990s and was debriefed by the Department of Corrections. 4 EHT 131–33. This resulted in Villalba being labeled a snitch by other inmates. 4 EHT 130. Villalba thereafter earned a reputation as a snitch among staff for giving authorities information against a correctional officer who killed his cellmate. 4 EHT 186–87. As recently as 2000, Villalba testified as a jailhouse informant in the murder trial of another inmate, Roy Garcia. 4 EHT 90. He would have little to lose by inculpating Nickerson here.

Also unlike the other witnesses with criminal histories in this matter, Villalba stands to gain tangible benefits directly from his testimony against Nickerson. Villalba's current sentence is the result of a plea agreement in which the prosecutor agreed not to seek the death penalty if Villalba pled guilty to murder and accepted a sentence of twenty years to life. 4

---

**19.** Villalba, a former member of the Nuestra Familia prison gang and heroin addict, confirmed that he had an extensive record of violent assaults before he was in jail, while he was in jail, and while he has been in prison. 4 EHT 83–84, 133–34, 178–85. He was a "regimen commander" in Nuestra Familia, and a "shot caller" that was responsible for ordering other gang members to commit violent assaults. 4 EHT 137–38, 172. Villalba also admitted to allowing his sister to perjure herself by testifying that she, rather than he, had been involved in a murder that he had committed. 4 EHT 152–53, 163–65.

EHT 147, 149–51. He has now served twenty years in prison. 4 EHT 140. At the time he contacted the state regarding information on Nickerson in 2001, he had recently received notification that his first hearing before the parole board had been scheduled for December 2002. 4 EHT 206–12. In light of his violent crimes and poor behavioral record in prison, the recommendation of the Santa Clara District Attorney's Office may be the only factors weighing toward Villalba's parole.

Villalba has previously gained prison benefits by testifying as an informant for state prosecutors. In 2000, Villalba testified in the Roy Garcia murder case pursuant to an agreement with the Santa Clara County District Attorney's Office. 4 EHT 90. Villalba wrote to the Santa Clara County District Attorney's Office on December 19, 1999, and told them that Garcia had made incriminating statements to him. Exh. 68. At the time, Villalba was in administrative segregation, which required him to be locked in a cell twenty four hours a day. 4 EHT 146. He also had extensive enemies among the staff and inmates.[20] 4 EHT 185–92. He had also had a documentation hearing a month before, in which he had been notified that he would be eligible for parole in 2003 but had received poor evaluations regarding his prison behavior. 4 EHT 198–201; Exh. 173. After testifying against Garcia, Villalba was moved to Mule Creek State Prison. 4 EHT 205.

Villalba has researched the law regarding parole extensively. 4 EHT 157, 167. At the time of his testimony in this case, he knew that the BPT will consider his violent history, including his convictions for murder, robbery and assault with a deadly weapon, and the particularly gruesome details of his crime.[21] 4 EHT 172–74. Villalba also knew that BPT would consider other factors: that he was a shot-caller in a gang who ordered the stabbing of other inmates, that he had personally attacked other inmates with knives or razors and assaulted a deputy sheriff, that he had tested positive for drugs and that he had been discovered with homemade knives. 4 EHT 174–84. Finally, Villalba knew that he had one letter in his file from the District Attorney's Office describing his cooperation in the Garcia case. 4 EHT 168–69, 173–84. Villalba considered that another letter would improve his chances of eventually getting out of prison. 4 EHT 169.

Villalba saw Nickerson being released on bail on television in 2001. 4 EHT 120. He later had a telephone conversation with Santa Clara County Deputy District Attorney Javier Alcala, the prosecutor with whom he had reached a deal for his testimony in the Garcia case. 4 EHT 121, 206. Villalba does not remember why he called Alcala, but testified that it had nothing to do with Nickerson. 4 EHT 122. Villalba did volunteer to Alcala that Nickerson had confessed to him years before. 4 EHT 121–22. The state agreed to inform BPT of Villalba's cooperation if he agreed to testify in this action. Exh. 69. Villalba also admitted that he had " already dug a hole" at Mule Creek State Prison and wanted to be moved. 4 EHT 214–16. Villalba has indicated that he is primarily motivated by his imminent parole hearings. At his first meeting and interview

---

**20.** Villalba left the gang in the early 1990s and was debriefed by the Department of Corrections. 4 EHT 131–33. This resulted in Villalba being labeled a snitch. 4 EHT 130. Villalba thereafter earned a "double snitch jacket" for giving authorities information regarding inmates and staff. 4 EHT 186–87.

**21.** Witnesses testified at Villalba's preliminary hearing that he beat a man to death with a baseball bat and laughed when the victim's eyes began popping out of his head. 4 EHT 172–73.

with Alcala and investigator Ray Medved, Villalba immediately asked the men to write the parole board to say that he was cooperating in the Nickerson case. 4 EHT 212; Exhs. 168, 199 (transcript and tape of interview).

Though Villalba testified to the details of the crime at the evidentiary hearing, when he was first interviewed on tape, he was unable to describe the crime with any particularity. Villalba testified that he and Nickerson worked closely together on a mistaken identity defense for Nickerson and that Nickerson told Villalba specific details about the crimes. 4 EHT 104–18. When he was initially interviewed, Villalba knew nothing of Nickerson's alibi defense, 4 EHT 117–18, 222; he did not know how Nickerson allegedly met Jahn, 4 EHT 218; how the crime was planned, 4 EHT 218; where Nickerson parked near the crime scene, 4 EHT 219; whether the perpetrators broke into Evans' house, 4 EHT 224; whether Evans was home at the time of the break-in, 4 EHT 224; whether any of the perpetrators were shot, 4 EHT 220; whether Evans' and King's pit bulls were present, 4 EHT 219; what kind of gun Nickerson supposedly used to shoot Evans, 4 EHT 114; the details of shooting Evans, 4 EHT 225; whether any of the victims were handcuffed, 4 EHT 227; how Nickerson left the scene, 4 EHT 117; and whether Nickerson left alone or with others, 4 EHT 115.

Even the story Villalba told at the evidentiary hearing is inconsistent with physical evidence of the crime and the trial testimony of prosecution witnesses. Villalba testified that Nickerson told him that all of the victims were in the house when the perpetrators arrived, and that Nickerson executed Evans after the robbers had gained control of Evans, Osorio, and King. This account fails to explain the location of Evans' body outside the front door of his house and the signs of a struggle near the

front door. It is also inconsistent with Osorio's version of events.

Even if Villalba's motive were less suspect, after observing him in court, the court finds his version of events to be rehearsed and unbelievable. When he was originally interviewed, Villalba did not know many of the important details of the crime. He did not know if any of the perpetrators had been shot nor did he know whether any of the victims had been handcuffed. His testimony at the hearing was much more detailed, to the point of being too well-tailored to the state's theory of events. While the court assumes no impropriety on the part of the Attorney General's office, no such assumption can safely be made with Villalba.

Given his demeanor at the hearing, the gaps and contradictions in the accounts he claims Nickerson offered him, his acknowledged need for the recommendation of the Santa Clara District Attorney's Office to offset an otherwise extremely violent prison record in his upcoming parole hearing, his recent procurement of prison benefits by offering similar testimony of inculpatory statements made by another inmate, the fact that he initiated the calls to his contacts at the Santa Clara District Attorney's Office in order relate his story about Nickerson only after seeing news stories about Nickerson's release in this action, and the lack of consequences for this additional instance of "snitching," the court finds Villalba entirely without credibility and discounts his testimony in its entirety.

### v. *Conclusion Regarding Schlup Gateway*

Nickerson has offered convincing evidence contradicting or impeaching the case which the state offered against him at trial. Bryan Tripp has recanted his identification, saying instead that the man he saw was "nowhere near" Nickerson's size. Tripp's recantation is supported by the

DNA identification of William Jahn as the bleeding runner. There is no testimony that any perpetrator, other than the bleeding runner, ran through the condominium complex, and the description Tripp initially gave police and which he reaffirmed at his recantation matches the description of William Jahn.

The state claims that Tripp's testimony was not central to determining the verdict at Nickerson's trial. This court cannot agree. First, the loss of Tripp's testimony poses a pressing doubt which, to date, the state has been unable to explain: how did a startlingly obese man manage to flee several blocks from the scene of the crime without being seen? *See* Exh. 18 (photograph of Nickerson at the 425–lbs. he weighed at the time of the Evans murders). Numerous witnesses saw men fleeing who were of average height and build. No witness besides Tripp testified to seeing a man flee who could have been Nickerson.

Second, Tripp was the most credible prosecution witness, and he had by far the best opportunity to view the man he identified as Nickerson. The state at trial relied on the testimony of methamphetamine abusers and manufacturers, as well as witnesses such as Robert Schattie, who openly admitted that he could not tell whether he dreamed his account of events or actually saw it. Tripp testified while employed as a deputy sheriff, and was impeached only with the fact that his initial identification did not fit Nickerson. Other eyewitnesses saw only masked men or men in shadows that they acknowledged they could not identify. Tripp saw the man he identified as Nickerson without a mask at a distance of fifteen feet. Tripp observed the man standing still for a significant period of time, looked about, turned in a circle, looked directly at Tripp and asked him where he was, and listened to Tripp's reply.

Tripp's credible identification formed the pillar which gave crucial support to the other, more questionable evidence introduced by the prosecution. Without Tripp's testimony placing Nickerson at the scene, this court is far from convinced that the jury would have credited the identification of Nickerson by Michael Osorio. The defense impeached Osorio's identification heavily at trial, establishing that it was inconsistent with the description of attackers he had given at the scene and during his first interview with Beck and Hall in the hospital. The defense called into question Osorio's ability to identify Nickerson, who he had only caught a glimpse of on a single occasion two years before the incident. The defense also offered significant evidence that Osorio had been led to identify Nickerson by Evans' previous warnings about the Nickersons and by inappropriate questioning by Detectives Beck and Hall while Osorio was recovering from brain surgery. Other evidence of misconduct on the part of Beck and Hall—in particular a tendency to question suggestively and to hide audio tapes or personal notes containing exculpatory information—further supports the defense theory that Osorio misidentified Nickerson because of overly aggressive questioning by police who should have known he was in a suggestive state after his brain trauma.

Judy Bryant's story of Nickerson's confession in the van ride provided powerful evidence against Nickerson at trial and certainly corroborated Osorio's identification of Nickerson as one of the perpetrators. At the later trial of Murray Lodge, however, Judy Bryant's credibility was destroyed though evidence of her drug abuse, her habitual lying, and her inconsistent accounts of the evening. The court cannot credit her testimony of the van ride confession as reliable evidence against Nickerson.

Sharon Silberhorn's testimony does little to support other identifications of Nickerson. Silberhorn testified that she saw Nickerson riding in a loud car in an apartment complex near Evans house the night before the murders, then awoke to the sound of yelling and the same loud car she had heard the previous night. At trial, Nickerson presented evidence that Silberhorn was unable to identify him until being shown to the courtroom for a preliminary hearing in which he was the sole defendant dressed in jail garb. At Lodge's second trial, Detective Beck later admitted that Silberhorn failed to identify Nickerson from an early photographic lineup. Even taking her identification of Nickerson on the previous night as accurate, her aural identification of the "loud car" that awoke her the night of the murders is both far less reliable and weaker proof of Nickerson's presence than Tripp's visual identification of the man he spoke with face-to-face as Nickerson.

The state gains no support from Robert Schattie's testimony that he saw a 'large man' outside Evans' house.[22] Mr. Schattie's testimony on its face cannot be credited. It would be highly suspect that two days after telling police on the night of the murders that he did not see anything, he remembered "in a daydream" a detailed vision of a man outside Evans' house. But additionally, Mr. Schattie himself admitted in his testimony that he simply did not know whether he had dreamed the account or not. His testimony that the man he saw fired two shots from a rifle or shotgun from outside Evans' house draws further suspicion from the lack of any evidence of such shots. Finally, the state now places far more weight on Schattie's testimony than the trial prosecutor, who in his closing sought to distance himself from

Schattie and ridiculed his testimony as the product of fumes from Evans' methamphetamine lab.

Nickerson has also produced significant positive evidence of his innocence. William Jahn, whose DNA matches that of the blood trail leaving Evans' house, has been tried and convicted on overwhelming evidence of participation in the Evans murders. This leaves four men imprisoned for a crime in which the surviving victim testified that he could only distinguish three attackers. The state argues that Osorio identified four attackers. Osorio plainly stated that he could only distinguish three attackers, RT 7161, and that while he saw at most three of the masked men in one room at one time, he thought that he might not have seen them all together, RT 7160. At best, Osorio testified that he could definitely distinguish three attackers, but there might have been more. The state's four perpetrator theory is also inconsistent with Osorio's first statements to Detectives Beck and Hall that the intruders were "three white men of average build." LT1 9527; Hall Interview Notes, Exh. 66.

At the time of the trial, Jahn's identity was not known and he was not a suspect in the Evans shootings. The state nonetheless maintains that the jury accepted a four person theory at Nickerson's trial, resting on the fact that the prosecution argued that an additional person had committed the crimes and shed the blood that did not match any named defendants. Simply because the prosecution mentioned the possibility of four defendants and obtained a conviction does not mean that the jury accepted a four person theory. Osorio's testimony and prior statements gave significant reason to believe that only three people committed the crime. Even

---

**22.** Schattie, a man of 240 pounds, described the man he saw as over 200 pounds, or as big as he was. Even if Schattie's fantastic vision were credited, the man he described would still only be half Nickerson's weight.

if the prosecution at some point during the lengthy trial stated that they believed a fourth perpetrator was involved, the jury would not have had to accept a four perpetrator theory to convict Nickerson and Hamilton, the only two defendants before them. The problem faced by the prosecution at trial, that no defendant's blood matched the trail, is far less exculpatory to Nickerson than the present fact that a man has been convicted for the Evans murders whose DNA does match the blood trail, who fits the descriptions given by numerous witnesses, who was seen with Hamilton that day, and who has all but confessed to the crime.

The prosecution also maintains that the conviction of Jahn exonerates Lodge and Hamilton as much as it exonerates Nickerson. While this argument would be sound if the evidence implicating Nickerson, Lodge, and Hamilton were identical, it is completely disingenuous in light of the actual record. Hamilton and Lodge were both tied to the scene by physical evidence, while Nickerson was not. Hamilton and Lodge have both confessed to the crime on several occasions, while Nickerson has not. Hamilton and Lodge match the description of the fleeing perpetrators, while Nickerson does not. On the day of the murders, Hamilton and Lodge were living with each other and Hamilton was seen with Jahn. No evidence indicates that Nickerson had any contact with Lodge or Hamilton at any time near the day of the murders, or that he had ever met Jahn. Comparison of the lack of evidence against Nickerson with the strength of the evidence supporting the convictions of Lodge and Hamilton leaves little doubt: the additional conviction of a fourth defendant could only exonerate Nickerson.

Nickerson also presented an alibi defense at his own trial supported by a number of witnesses. While the state correctly notes that the jury must have rejected Nickerson's alibi in convicting him, they did so only when weighing the alibi testimony against the incriminating testimony of Brian Tripp and Judy Bryant. With this crucial testimony recanted or heavily impeached, Nickerson's alibi becomes substantially more plausible, and the court cannot say that a jury would simply have rejected it out of hand. The state does not point out any inconsistency or other reason to doubt Nickerson's alibi evidence. The trial testimony of Nickerson's alibi witnesses therefore remains exculpatory.

Finally, Lodge, Hamilton, and Jahn have each exonerated Nickerson. The court has already detailed its finding that Lodge gave credible testimony at the evidentiary hearing. While the court does not lightly credit the statements of criminals with histories of violence and deceit, the circumstances under which the statements have been made and the consistency with which the defendants have exonerated Nickerson at all times and to all audiences lend credibility to their accounts. Their statements, and in particular the live testimony of Murray Lodge, do constitute evidence of Nickerson's innocence.

The court finds that Nickerson has carried his burden under *Schlup* and shown that more probably than not he is innocent of the crimes for which he was convicted. Although his claims have been procedurally defaulted in state court, to avoid a miscarriage of justice, the court nonetheless addresses Nickerson's substantive claims.

*SUBSTANTIVE CLAIMS*

I. *Standard of Review*

A petition for habeas corpus from a state court conviction is governed by the standards set forth in 28 U.S.C. section 2254.[23] Section 2254 sets a deferential

---

**23.** Congress amended section 2254 through the 1996 passage of AEDPA. Nickerson filed this habeas petition in 1998, well after the

standard of review by a federal district court of "any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Under this standard, a petition for habeas corpus should not be granted unless the state court decision on the merits was "contrary to or involved an unreasonable application of clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

■■■■■ By the plain text of the statute, the deferential standard in section 2254(d) applies only for those claims which were addressed on the merits in state court proceedings. A state court's rejection of the petitioner's claims on procedural grounds does not trigger deference under section 2254(d). For purposes of determining whether section 2254(d) applies, a district court looks to the grounds of the decision of the highest state court to offer a reasoned opinion. *Liegakos v. Cooke,* 106 F.3d 1381, 1385 (7th Cir.1997); *cf. Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (applying presumption that last reasoned judgment of state court provides grounds on which decision rests for purposes of procedural bar inquiry). A federal district court therefore does not apply the standard of review set forth in section 2254 if the highest state court to offer a reasoned opinion rested its dismissal of the claim on procedural grounds. This is true even where a lower state court addressed the merits of a claim. *Liegakos,* 106 F.3d at 1385.

■■■■■ Prior to the passage of AEDPA, federal habeas courts conducted independent, *de novo* review of pure questions of law and mixed questions of law and fact that had been addressed by state courts.

*See Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of O'Connor, J.) (contrasting deference under 2254(d)(1) with the "previously settled rule of independent review"); *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (conducting independent review of mixed questions of law and fact); *Wright v. West,* 505 U.S. 277, 291, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (noting that recent limits on retroactive application of new rules of constitutional law were an exception to the rule of *de novo* review of pure questions of law and mixed questions of law and fact). In the absence of a state court adjudication on the merits, the "previously settled rule of independent review" remains unmodified by section 2254(d)(1). Accordingly, federal district courts conduct *de novo* review of a habeas petitioner's claims which were dismissed on procedural grounds in state proceedings. *Hooks v. Ward,* 184 F.3d 1206, 1223 (10th Cir.1999); *see also Killian v. Poole,* 282 F.3d 1204, 1208 (9th Cir.2002) (reviewing *de novo* claim on which evidence had not been heard in state courts); *Hudson v. Hunt,* 235 F.3d 892, 895 (4th Cir.2000) (applying *de novo* review to claims which state court had dismissed on procedural grounds); *Miller v. Johnson,* 200 F.3d 274, 281 n. 4 (5th Cir.) ("Review is *de novo* when there has been no clear adjudication on the merits."), *cert. denied,* 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000).

■■■■■ Although the California Superior Court addressed the merits of Nickerson's claims as an alternative ground for its denial of his habeas petition, the California Supreme Court denied his petition only on procedural grounds. *See Hunter,* 982 F.2d at 348 (finding that a summary denial by the California Supreme Court citing to state authority relating to procedural defi-

effective date of AEDPA. The statute as modified by AEDPA therefore applies to this case.

ciency represents a procedural disposition). Because the highest state court to address Nickerson's petition denied it on procedural grounds, the deferential standard of review set forth in section 2254(d) does not apply, and this court reviews Nickerson's claims de novo.

 State court finding of facts are presumed correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Pollard v. Galaza, 290 F.3d 1030, 1035 (9th Cir.), cert. denied, — U.S. —, 123 S.Ct. 449, 154 L.Ed.2d 343 (2002). This presumption of correctness does not attach to a state court's determinations on mixed questions of law and fact. Powell v. Gomez, 33 F.3d 39, 41 (9th Cir.1994). While factual findings made by a state appellate court may also be presumed correct, Pollard, 290 F.3d at 1035; Sumner v. Mata, 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), the Ninth Circuit has explicitly reserved the question whether section 2254(e)(1) requires deference to factual findings of a state trial court when a higher state court has affirmed the case without relying on the findings, Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000). Because the state has pointed to no finding of fact by the state trial court relevant to the issues presented addressed in this order, the court need not resolve this issue.

## II. Claim One: Deprivation of Due Process through Police Misconduct

Nickerson alleges that police misconduct so permeated the investigation of the crime and testimony at trial so as to violate his due process rights. In particular, Nickerson alleges that Detectives Beck and Hall influenced Brian Tripp's misidentification of Nickerson at trial and caused Michael Osorio to identify petitioner by suggestively interviewing him in his hospital room hours after brain surgery. In support of his claim, Nickerson presents evidence of a pattern of highly suspect police practices in the interviews of Tripp, Osorio, Silberhorn, and Nickerson's alibi witnesses. Nickerson also offers the finding of a state trial court that Detectives Beck and Hall first egregiously manipulated evidence and destroyed exculpatory materials in the course of their investigation of the Evans murders, then perjured themselves in the separate trial of Nickerson's codefendant Lodge in order to hide their conduct. Finally, Nickerson asks that the court consider the absence of reliable corroborating evidence of his guilt as further circumstantial evidence that the identifications elicited by the police were the product of improper influence.

### A. Legal Standard

 It is long established that even the unintentional use of identification procedures that are so suggestive as to give rise to a substantial likelihood of mistaken identification may violate due process. United States v. Jones, 84 F.3d 1206, 1209 (9th Cir.), cert. denied, 519 U.S. 973, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996); Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). An identification procedure is suggestive when it increases the likelihood of misidentification by emphasizing the witness's focus upon a single individual. United States v. Montgomery, 150 F.3d 983, 992 (9th Cir.), cert. denied, 525 U.S. 917, 119 S.Ct. 267, 142 L.Ed.2d 220 (1998). An impermissibly suggestive pretrial identification procedure may not necessarily be cured by subsequent in-court identifications. Id. at 991 (quoting United States v. Bagley, 772 F.2d 482, 492 (9th Cir.1985)).

Nickerson's allegations that the police deliberately manipulated Tripp and Osorio into identifying him portray misconduct far more serious than the mere use of sugges-

---

tive identification procedures. Nickerson alleges that Beck and Hall deliberately molded identifications in order to gather evidence against him, simply because they believed from the moment they came on the scene that he committed the crime as an act of revenge for the shooting of his brother.

This court considers presentation of eyewitness identifications that result from intentional pressure by police to identify a particular subject more akin to presentation of false evidence or perjured testimony than to the inadvertent use of a suggestive identification technique. "A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness." *United States v. Young*, 17 F.3d 1201, 1203–04 (9th Cir.1994). Any conviction obtained by the state's unknowing use of false evidence or perjured testimony therefore requires a new trial if there is a reasonable probability that without the evidence the result of the proceedings would have been different. *Killian*, 282 F.3d at 1208; *Spivey v. Rocha*, 194 F.3d 971, 979 (1999), *cert. denied*, 531 U.S. 995, 121 S.Ct. 488, 148 L.Ed.2d 461 (2000).

Insofar as Nickerson claims that pervasive misconduct rendered his trial unconstitutional, the standard for relief is more general. "A habeas petition will only be granted for prosecutorial misconduct when the misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Sassounian*, 230 F.3d at 1106 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).

B. *Factual Support for Police Misconduct Claim*

1. *Tripp Recantation*

Brian Tripp testified at Nickerson's trial that he was "positive" that the man who had run into his parking area just after the murders was Nickerson. RT 6443. When he appeared at Murray Lodge's trial five years later, Tripp unequivocally recanted his previous testimony and stated that the man he saw "was nowhere near the size Buddy Nickerson is." LT1 7998–99, 8002–03. Tripp had first described the man he saw to Beck and Hall as standing five feet eleven inches to six feet tall and weighing 190 to 200 pounds, with darker straight hair and a moustache to the corners of his mouth. LT1 8002–03. He reaffirmed his original description at Lodge's trial.

Tripp's recollection of events reveals that Detectives Beck and Hall engaged in suggestive questioning that ultimately led Tripp to misidentify the man he saw as Nickerson. Tripp testified that Beck and Hall visited him on a few occasions and showed him pictures of possible suspects. LT1 7999–8000. When Tripp was unable to identify any of the pictures, he recalled that the officers were disappointed. LT1 8018–19. The second time Beck and Hall showed Tripp pictures of possible suspects, Tripp remembers the officers asking pointed questions, such as "are you sure he wasn't heavy set, are you sure his face wasn't pudgier[?]" LT1 8019. Tripp said that "during the contacts with the officers, I began to think maybe I wasn't seeing the subject that I should have seen run through that area. I got the feeling I should be looking for somebody heavier." LT1 7999. Tripp also testified that "as the investigation continued, I began to feel that they had a suspect in mind that I was close to, uhm, helping them convict or investigate, but I could never actually pinpoint him to the point that I felt that I should go up some weight and some description which would meet their expectations." LT1 8000. "Being eighteen and naive, I could still sense things. I could sense they [Beck and Hall] were disappointed." LT1 8018–19. Tripp also testi-

fied that he was "moved off" the shoulder length brown straight hair he originally described to "more of a dirty blond wavy style hair." LT1 8001–02. He also acknowledged that he identified Nickerson, who had an obvious full beard, even though he distinctly remembered that the man he saw had only a moustache. RT 8002–03.

In testifying at Lodge's trial, Tripp showed obvious reluctance at any suggestion that the police officers intentionally led him to misidentify the man as Nickerson. He testified that although he thought that he should be describing someone heavier, "It was never outright said that, and I don't think they purposely meant to portray that . . . ." LT1 7999. He testified that when Beck and Hall presented him with a second photographic line-up after failing to identify anyone from the first, "they were leaning—not leaning, but I remember them asking questions, are you sure he wasn't heavy set[?] are sure his face wasn't pudgier[?]" LT1 8019. As a deputy sheriff, Tripp no doubt had little desire to cast aspersions on the reputation of his fellow officers by accusing them of manipulating witnesses, and his testimony should be viewed with this in mind.[24]

Whatever Tripp's stated opinion regarding Beck and Hall's intentions, his testimony indicates strong pressure to alter his description to fit Nickerson. Several aspects of his testimony indicate that something more than Tripp's unreliable memory was at work here. First, Tripp testified that the officers repeatedly gave him cues and asked him leading questions while he had a photographic line-up in front of him. Second, the fact that Tripp

eventually identified Nickerson, who barely resembled the man he had initially described, indicates that Tripp clearly got the message as to how he needed to revise his weight estimates and change the hair and beard in order to reach the result the officers wanted. Third, the drastic difference between Tripp's original description and Nickerson's physical appearance did not appear to give pause to Beck or Hall, who ceased interviewing Tripp after receiving the identification they wanted. Finally, the fact that Tripp ultimately recanted his testimony and reaffirmed his original description strongly suggests that something actively led him astray during the investigation and prosecution of Nickerson.

On its own, Tripp's testimony would likely be insufficient to support a finding that Detectives Beck and Hall led him to misidentify the man he saw as Nickerson. In addition to Tripp's testimony, however, Nickerson presents substantial evidence of similar instances suggesting that Beck and Hall pressured witnesses and altered evidence throughout the investigation.

### 2. *Nickerson—The First Suspect*

According to his own police report, Detective Beck suspected Nickerson played a role in the Evans murders almost immediately after learning of the crime. Beck's report indicated that after a review of the scene and interviews with eyewitnesses provided no information on the perpetrators, Beck's first act was to send a patrol car to locate Nickerson at his mother's house in the middle of the night. Police Report of Sgt. Brian Beck, dated Sept. 16,

---

24. In examining Tripp at Lodge's trial, the district attorney carefully avoided implying any misconduct on the part of police officers in part by asking about contacts Tripp may have had with defense investigators. In response, Tripp testified at one point that defense investigators as well as prosecutors asked about the weight that he had described. LT1 8000. Aside from this single exception, his testimony regarding the questioning that lead to his identification of Nickerson pertained only to the questioning by police officers. LT1 7998–8003, 8018–19, 8035.

8:30 am, Exh. 36, at 3. Beck wrote in his report, "Due to a prior incident at this residence where Evans shot Buddy Nickerson's brother Harry 'Nicki' Nickerson, I felt that there was a possibility of a retaliation shooting." *Id.* Finding that Nickerson was not at his mother's house, the police went in search of Nickerson's brother Richard, who by 9:00 am they had located and questioned regarding his and Nickerson's whereabouts. *Id.* At this point in the investigation, Beck's notes do not indicate any physical evidence or eyewitness descriptions that suggested Nickerson was involved in the crime.

The court in no way condemns Detective Beck for employing his own knowledge of prior incidents to direct the investigation at its nascent stages. The report does show, however, that Beck knew of Nickerson and that Nickerson had become a suspect in Beck's mind before Beck first interviewed Tripp, Osorio, and Silberhorn in the days following. It appears likely, based on Beck's knowledge and the other evidence of his conduct, that he guided witnesses towards identification of Nickerson from the beginning of the investigation.

### 3. *Proof of Other Misconduct*

As support for his claim that Tripp's misidentification can be ascribed to misconduct by Beck and Hall, Nickerson points to the finding that Beck and Hall engaged in flagrant misconduct in the investigation of the Evans murders by inducing inculpatory statements from Lodge, hiding exculpatory evidence by attempting to destroy a tape of the statements, and blatantly lying from the stand as to the circumstances under which the statements were made and the whether the statements had been recorded.

Beck and Hall testified that while driving Lodge from Carson City, Nevada to the Santa Clara County Jail, Lodge volun-

tarily made incriminating statements. Answer, Exh. T at 42. Beck prepared a police report in which he stated that Lodge made voluntary incriminating statements. LT2 16541, 16557; Exh.19 at 00716. Both Beck and Hall testified that the conversation was not recorded. An audio tape of the conversation was later discovered by Lodge's counsel in a 'recycling' box of tapes that were to be reused. LT2 16530; Exh. 20 (transcript of tape). The tape revealed that Lodge's statements were not voluntary and spontaneous as Beck and Hall had testified, but occurred only after continued questioning by Beck and Hall.

Judge Foley, the same judge who presided over the Nickerson trial, found that Beck and Hall engaged in a plan to commit misconduct because they did not get the smoking gun they wanted. He explained:

Why was the tape preserved? It wasn't meant to be preserved. They extracted one statement they deemed relevant, but since they didn't have the smoking gun statement, they consigned the tape to the recycling box, supposedly never to see the light of day again. LT1 13150. [T]he tape was consigned to what I call the recycling box. These officers had a habit throughout the investigation in this case to record witnesses' statements, review them. [*sic*] If they thought them relevant, they would prepare a report, and throw the tape back into the box to be recycled in interviewing other witnesses and tape recording them. This particular tape was never supposed to see the light of day again. Unfortunately [for them], it did. LT1 13159.

I believed and trusted these officers for seven years, and I just can't believe they did this, but with the facts that I have before me, there is no other conclusion I can reach. LT1 13153.

The court discharged the jury, telling them, "It is my belief that the officers willfully perjured themselves in your presence." LT1 13160.

Judge Foley granted a mistrial due to the discovery of Beck and Hall's perjury. He explained his decision to counsel:

What effect does this [misconduct] have overall? Certainly puts in question in my mind all the testimony of Sergeant Hall and Lieutenant Beck. LT1 13150. Are we to believe the officers in the particulars they gave regarding other witnesses who may have testified at this trial? LT1 13150.

Judge Foley proceeded to outline the reasons defendant Lodge had not had a fair opportunity to investigate and why he was declaring a mistrial to give the defense an opportunity to re-examine the case in light of the revelations. LT1 13151–62.

The evidence in Lodge's trial indicates— and Judge Foley explicitly found—that Beck and Hall lied about the voluntariness of a 'confession,' prepared false police reports and unmistakably perjured themselves from the witness stand in a criminal trial. This court agrees with Judge Foley that this egregious and intentional misconduct calls into question Beck and Hall's integrity in the other proceedings involving the Evans murders. Judge Foley himself asked the question that is at the heart of Nickerson's claim: "Are we to believe the officers in the particulars they gave regarding other witnesses who may have testified at this trial?" LT1 13150.

The state argues rather disingenuously that this court should ignore as irrelevant Beck and Hall's proven misconduct because it did not directly affect the outcome of Nickerson's trial in which Lodge's confession was not introduced. The state further argues that it would violate the prior bad acts rule of Federal Rule of Evidence 404(b) to make the leap that Beck and Hall's misconduct as it relates to Lodge necessarily impugns their investigation of Nickerson.

The court finds the attempt to isolate Beck and Hall's misconduct to Lodge's confession unconvincing. The state fails to acknowledge the gravity of Beck and Hall's misconduct. These are serious constitutional violations, carried out with the specific intent of deceiving the court and distorting the fact-finding process. Beck and Hall committed these acts in the course of a single investigation in which they were the primary investigators and which led to Nickerson's conviction. Beck and Hall perjured themselves at the trial of Nickerson's codefendant in support of the same theory of the crime that the state presented at Nickerson's trial.

It is beyond credulity that Beck and Hall would have been so intentionally manipulative with respect to this one piece of evidence, but been entirely scrupulous in every other aspect of the investigation. There is no doubt that this revelation calls into doubt Beck and Hall's reliability and integrity, and therefore calls into doubt much of the case against Nickerson, which bears the imprint of Beck and Hall's investigation at every step.

General doubt as to the integrity of the investigating detectives would not on its own constitute a constitutional defect in Nickerson's trial. Here, however, there is independent direct and circumstantial evidence of misconduct with respect to a key prosecution eyewitness, Brian Tripp, and perhaps with respect to other witnesses as well. The court cannot ignore Beck and Hall's record of dishonesty when examining specific evidence of misconduct in the very same case. Beck and Hall's proven willingness to manipulate evidence and to deceive the court gives strong reason to conclude that Brian Tripp's misidentification of Nickerson also resulted from similar misconduct.

#### 4. *Beck and Hall's statements to witnesses*

As further proof that Beck and Hall attempted to manipulate the facts presented to the trial court, Nickerson introduces evidence that Beck and Hall employed tactics of intimidation to prevent witnesses from testifying to his alibi or giving other exculpatory information. At Lodge's trial, Kristin Banks testified that she told Beck and Hall that Nickerson had been at her house on the night of the killings. LT1 16223. In response, Beck and Hall accused her of being an aider and abettor, put her in handcuffs and placed her in a police car. LT1 16223–24. They told her she was going to jail and that they would put her child in a shelter if they were unable to find someone to watch her. LT1 16224. Other witnesses assert that when they volunteered information exculpatory to Nickerson, Beck and Hall accused them of lying or threatened to arrest them.[25] LT1 12635–37 (Dion Banks); LT1 12428 (Kelly Bryant).

■ Government intimidation or harassment designed to discourage witnesses from testifying, through threats of prosecution for perjury or other offenses, may rise to the level of a due process violation where the threats lead to a witness's decision not to testify. *United States v. Angiulo,* 897 F.2d 1169, 1192 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *see also United States v. Morrison,* 535 F.2d 223, 229 (3d Cir.1976). Because none of Nickerson's alibi witnesses were actually dissuaded from testifying, no defect occurred in Nickerson's trial. *Id.* Nonetheless, Beck and Hall's shocking treatment of Kristin Banks constitutes the sort of deliberate attempt to manipulate evidence that is contrary to basic principles of due process and gives credence to the theory that Tripp, Osorio, and other government witnesses were pressured into giving Beck and Hall's version of the case.

#### 5. *Other Alleged Instances of Misconduct*

Nickerson argues that there is at least circumstantial evidence of misconduct in Beck and Hall's interviews of Sharon Silberhorn and Michael Osorio, which he maintains proves that Beck and Hall made a regular practice of manipulating witnesses and hiding of exculpatory evidence.

##### i. *Silberhorn Line-up and Interview Tape*

During Lodge's first trial, Beck and Hall revealed that they did not preserve the photographic lineup that they showed to Sharon Silberhorn the first time they interviewed her. LT1 10579; LT1 10840–41; LT2 16678–80. If the photographs were presented in the order in which they are recorded in the officers' notes, then Silberhorn picked out as possible matches to the person in the car the photographs of Richard Nickerson (petitioner's brother), Micky King, and Mike Riley, but excluded other photographs, including that of "Buddy" Nickerson. LT2 16677–78. Detective Hall testified, however, that because the lineup had not been preserved, he could not say which photographs Silberhorn had picked or whether she picked a picture of petitioner Nickerson. LT2 16680–82. Beck later admitted that Silberhorn failed to identify Nickerson from the lineup, that he and Hall had failed to include this information in their report, and that they failed

---

**25.** Dion Banks testified that he told Beck and Hall that Nickerson was at his house the night of the killings. LT1 12637. The officers told him he was under arrest and that he was a liar and was not a very good one. LT1 12635–37. Judy Bryant's husband, Kelly, testified that he told Beck and Hall that Nickerson said that he was not interested in retaliating against Evans. LT1 12428. Beck and Hall called him a liar. LT1 12428.

to preserve an audio tape recording the interview. LT2 17176–78.

ii. *Hall's Report on Osorio's Statements*

Nickerson argues that circumstances surrounding Michael Osorio's identification of Nickerson indicate improper questioning by Beck and Hall and the hiding of exculpatory evidence. According to Detective Beck, Osorio "emphatically" identified Nickerson a few hours after undergoing brain surgery. Osorio testified at trial that he was certain Nickerson had been one of the attackers, and that his confidence in his identification was ten on a scale of one to ten.

Several aspects of Osorio's identification raise questions about the propriety of Beck and Hall's interview. First, Osorio departed from his initial descriptions significantly in identifying Nickerson. On the scene, while alert enough to give his name and answer questions, Osorio said that he did not know the masked men. At his first interview with Beck, Osorio gave contrary descriptions of the attackers as "three white men of average build." This description of the attackers' physiques excludes Nickerson, who at 425 pounds had a build that was anything but average. The number of attackers described also suggests that only Lodge, Hamilton and Jahn participated. At the next interview, only hours later, Osorio changed his description enough not only to be consistent with Nickerson, but to identify him "emphatically."

Second, it is highly questionable whether Osorio was sufficiently familiar with Nickerson to identify him "emphatically." The full extent of their contact consisted of a single occasion two years before when Osorio had glimpsed Nickerson while Nickerson worked on Evans' yard. Osorio did not meet Nickerson, did not look at his face, and could not remember whether he had been wearing a shirt or not. Nonetheless, he confidently identified Nickerson as one of the masked attackers hours after emerging from brain surgery. His lack of familiarity with Nickerson suggests that he may have believed Nickerson was an attacker for reasons other than that he recognized his attacker.[26]

Third, Beck's interview occurred at a time when Osorio was in a particularly impaired state and may have been prone to suggestion. Beck interviewed Osorio soon after he had been shot in the head and had undergone brain surgery for the wound. By the time he testified, Osorio could not remember the interview or Beck and Hall's presence in the hospital, but remembered only Beck's voice. Dr. Kiernan, a neuropsychologist, testified that both the injury and the surgery could cause edema, or swelling of the brain, which would impair brain functions. LT2 12657. Although the type of brain injury Osorio received would not necessarily make him particularly prone to suggestion, according to Dr. Kiernan a person's ability to process information may be somewhat suspect for at least a day after brain surgery, particularly if the person has received a general anesthetic. LT2 12657–58. Dr. Kiernan further stated that sometimes others may make suggestions regarding what happened during an event and those suggestions may be incorporated into one's memory of the event. LT2 12659. Beck and Hall's propensity for aggressive, leading questioning of eyewitnesses has been illustrated by the testimony of Brian Tripp.

Finally, Beck and Hall acted improperly in the interviews of Osorio with respect to

---

26. Various factors other than pressure by Beck and Hall could have caused Osorio to identify Nickerson, including that Evans had told him to expect trouble from Nickerson, that he thought Evans' girlfriend had received threatening calls from Nickerson at the house, and that he heard Micky King call one of the attackers 'buddy.'

the preservation of exculpatory materials. Although Beck and Hall recorded Osorio's initial descriptions which were inconsistent with Nickerson in Hall's personal notes, they did not include the exculpatory descriptions in their police reports. Hall's notes were not uncovered until the state court ordered the detectives to turn them over in discovery. The court is hard pressed to find an explanation for such a glaring omission from Hall's report other than that it was another deliberate attempt to manipulate the evidentiary record. The court also notes that although the detectives regularly tape recorded their interviews, no tape has emerged containing the hospital interviews with Osorio, the only surviving eyewitness of the crime.

### C. Conclusions Regarding Misconduct

Beck and Hall engaged in improper practices in their interviews of Tripp, Osorio, Silberhorn, and Nickerson's alibi witnesses. The detectives routinely suppressed exculpatory statements made during interviews by destroying audio tapes of interviews and selectively including witness statements in their police reports. The detectives destroyed a tape of their initial interview with Sharon Silberhorn at which she failed to identify Nickerson from a photographic lineup that the officers also failed to preserve. The detectives attempted to hide exculpatory material in their notes of their interview with Osorio. The detectives harassed Nickerson's witnesses in a manner that would certainly have constituted constitutional violations of Nickerson's rights had the witnesses been dissuaded from testifying. With respect to the incriminating statements made by Lodge and presented at his trial, the detectives prepared false police reports and lied in open court by representing that Lodge made the statements spontaneously and voluntarily and that they did not make an audio recording of the interview.

The circumstances of Beck and Hall's interview with Osorio strongly suggest that Beck and Hall influenced Osorio to identify Nickerson. In particular, the timing of the interview hours after Osorio emerged from brain surgery, the detectives record of leading questioning, the extent to which Osorio's identification contradicted the accounts he gave only hours before, the fact that the detectives attempted to hide Osorio's initial contradictory descriptions, and Osorio's lack of personal familiarity with Nickerson and his inability to examine photographs at the time he was interviewed all indicate that Beck and Hall likely led Osorio to identify Nickerson as an assailant.

It is also true that no information has been brought forth regarding the questions asked of Osorio by the detectives, and Osorio has not recanted his identification. Nickerson also raised the issue of Osorio's susceptibility to suggestion at trial as impeachment evidence. Under these circumstances, the court cannot find that Nickerson has produced sufficient existence to warrant a new trial based solely on misconduct in the interview of Osorio.

Brian Tripp's misidentification of Nickerson provides the strongest evidence of misconduct on the part of Beck and Hall. Tripp has recanted his testimony and stated that Nickerson could not have been the man he saw, raising pressing questions as to why he falsely identified Nickerson in the first place. His account of questions asked by Beck and Hall indicates that they deliberately guided him towards identifying Nickerson. His testimony constitutes a sufficient showing for this court to find the identification procedure unconstitutionally suggestive in its focus on Nickerson. *Jones,* 84 F.3d at 1209; *Montgomery,* 150 F.3d at 992.

When viewed against the backdrop of Beck and Hall's repeated manipulation of

evidence, suppression of exculpatory materials, harassment of defense witnesses, and perjury before the court, the obviously leading questioning of Tripp appears decidedly deliberate. Beck and Hall must have known the extent to which Tripp's final identification of Nickerson contradicted the previous descriptions he had given of the man he saw. Accordingly, the court finds that Beck and Hall deliberately induced Tripp to misidentify Nickerson knowing that Nickerson was probably not the man he had seen. The presentation of this evidence calls into question the fundamental fairness of Nickerson's trial. *Young*, 17 F.3d at 1203–04. Accordingly, Nickerson's petition must be granted if there is a reasonable probability that without Tripp's testimony, the result of Nickerson's trial would have been different. *Killian*, 282 F.3d at 1208; *Spivey*, 194 F.3d at 979.

As previously discussed, Tripp's identification is by far the most reliable account placing Nickerson at the scene and formed the cornerstone of the prosecution's case. Tripp's account was not simply cumulative with the identifications by Osorio and Silberhorn, which were far less credible and reliable and which were of dubious value without Tripp's identification as corroboration. Consequently, the court finds that there is a reasonable probability that without Tripp's testimony, the jury would not have found Nickerson guilty. Beck and Hall's misconduct in influencing Tripp's identification therefore constitutes a deprivation of due process which requires a new trial.

Addressing the evidence through the framework of prosecutorial misconduct requires the same conclusion. When considered in sum, the evidence indicates that the manipulation of evidence and failure to

disclose exculpatory materials pervaded Beck and Hall's investigation and the evidence at trial. There is almost no evidence in the case against Nickerson which cannot reasonably be questioned as potentially the product of improper police conduct. This complete lack of independent corroborating evidence of Nickerson's guilt deeply concerns the court. When the independent evidence of Nickerson's innocence discussed *ante* is considered, the conclusion seems inescapable that Nickerson's conviction rests largely on manipulations by Beck and Hall. Apart from the specific finding of misconduct in the interview of Brian Tripp detailed above, the court finds that Beck and Hall's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Sassounian*, 230 F.3d at 1106.

## CONCLUSION

Because the court finds Nickerson's trial constitutionally defective due to police misconduct in the investigation, the court need not reach Nickerson's claims of ineffective assistance of counsel and conflict of interest. For the reasons set forth above, Nickerson's petition for writ of habeas corpus is GRANTED. Nickerson's convictions are VACATED and respondent is ORDERED to release Nickerson from custody within sixty (60) days of the date this order is filed unless the State of California reinstitutes criminal proceedings against him.

In view of the scant credible evidence supporting the petitioner's conviction, pending retrial or appeal the petitioner is ORDERED RELEASED ON BAIL in the amount of $250,000, secured and subject to conditions of release as determined appropriate by the General Duty Magistrate Judge.[27] Respondent shall produce the

---

27. The court notes that Nickerson was previously released on bail to the custody of his

father and stepmother, who have agreed to provide housing for him pending completion

petitioner before the General Duty Magistrate Judge of this court within five (5) days of the date of this order for the purposes of accomplishing the bail and release provisions set forth above.

IT IS SO ORDERED.

of these proceedings, and that he voluntarily surrendered to custody promptly upon revocation of the bail order.